IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action Number: _____

DAVID A. BOVINO P.C., and
DAVID A. BOVINO,

      Plaintiffs,

v.

UBS TRUST COMPANY, N.A.,
UBS FINANCIAL SERVICES, INC, and
TIMOTHY D. KELLY,
KELLY AND HANNAH, P.A.

      Defendants.

---

## PLAINTIFFS' ORIGINAL COMPLAINT

---

### I. PARTIES

1.      Plaintiff David A. Bovino P.C. dba Law Offices of Bovino & Associates is a professional law corporation with its principal place of business at 600 E. Hopkins Avenue, Suite 301, Aspen, Colorado.

2.      Plaintiff David A. Bovino is a resident of Pitkin County, State of Colorado, residing at 804 Hunter Creek Road, Aspen, Colorado.

3.      Defendant UBS Financial Services, Inc. is a Delaware corporation with its principal place of business at 1200 Harbor Blvd., Weehawken, NJ 07086. UBS Financial Services, Inc. can be served with process through its registered agents Corporation Service Company, 1560 Broadway, Suite 2090, Denver, Colorado 80202 and Corporation Service Company, 80 State Street, Albany, NY 12207.

4.      Defendant UBS Trust Company, N.A. has a place of business at 500 Delaware

Avenue, Suite 900, Wilmington, DE 19801, at 100 Harbor Boulevard, Weehawken, NJ 07086

and at 10 East 50th Street, New York, NY 10022. It is also registered as a foreign entity in Texas.

UBS Trust Company, N.A can be served with process through its registered agent James P.

McCarthy, 10 East 50th Street, New York, NY 10022 and through its President, Richard J.

Immersberger, at 500 Delaware Avenue, Suite 900, Wilmington, DE 19801.

5.      Defendant Timothy D. Kelly is a lawyer practicing in Minnesota and Chief

Executive Officer of Timothy D. Kelly P.A. a/k/a Kelly and Hannah, P.A., located at 80 South

8th Street, 3720 IDS Center, Minneapolis, Minnesota 55402, USA where he can be served.

Timothy D. Kelly can also be served at his place of business Dykema Gossett PLLC, 4000 Wells

Fargo Center, 90 South Seventh Street, Minneapolis, MN  55402.

6.      Defendant Kelly and Hannah, P.A. f/k/a Timothy D. Kelly P.A. is a Minnesota

law firm and can be served with process through its registered agent at 80 South 8th Street, 3720

IDS Center, Minneapolis, Minnesota 55402, USA.

## II.  JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over Bovino's claims pursuant to 28

U.S.C. § 1331 because this action arises under the laws of the United States. In addition, this

Court has supplemental jurisdiction, pursuant to 28 U.S.C. § 1367, over all state law claims that

are related to Plaintiffs' federal claims.

8.      This Court has personal jurisdiction over UBS Trust Company, N.A., UBS

Financial Services, Inc. (collectively, "UBS"), Timothy D. Kelly, and Kelly and Hannah, P.A.

(collectively, "Kelly") because UBS and Kelly have engaged in substantial, continuous, and

systematic contacts within the State of Colorado. In addition, UBS and Kelly have purposefully

directed tortious acts at the State of Colorado, and this litigation results from injuries that arise out of or relate to those tortious acts.

9.      Venue is proper in this district, pursuant to 28 U.S.C. § 1391(b)(2), because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in the State of Colorado.

### III.  FACTUAL BACKGROUND

### A.      The MacMillan Family.

10.      In 1974 and 1980, John H. MacMillan III ("JHM III")created various trusts for the benefit of his current and future children. As of 2004, the combined value of the trusts was approximately $900 million. Andrew Cargill MacMillan ("Andrew") was born during JHM III's marriage to Patricia MacMillan ("Patricia") and is therefore a direct beneficiary of these trusts.  Patricia is not a beneficiary and is not entitled to any funds from the trusts.

11.       In 2000, two of JHM III's older children from a previous marriage initiated a legal proceeding that sought, among other things, to have JHM III declared incompetent, for them to be appointed guardians, and for the court to determine the beneficiaries of the various trusts. Years of litigation followed and culminated in a 2006 Settlement Agreement, which governs the terms and conditions of Andrew's trusts.[1] In late 2009 or 2010 the trusts were transferred from Bank of America to UBS, specifically to Jan Klein, Senior Vice President for Investment at UBS Financial Services ("Klein"). UBS earned millions of dollars in fees and commissions for managing and investing money in the trusts.

---

[1]   *In the matter of the Trusteeship of the Trust Created Under Trust Agreement Dated December 31, 1974, and In the Matter of the Trusteeship of the Trust Created Under Trust Agreement Dated December 30, 1980; and In the Matter of the Trust Created Under Trust Agreement Dated December 30, 1980*, 674 N.W.2d 222, 225-226 (Minn. Ct. App. 2004).

12.     Andrew was born during the marriage of his mother, Patricia to JHM III, the late great-grandson of W.W. Cargill, the founder of Cargill, Inc. and the son of John H. MacMillan, Jr., past Chairman and CEO of Cargill. JHM III died in 2008 with a fortune estimated at $1.6 billion. If it were a public company, Cargill would rank, as of 2011, number 13 on the Fortune 500, behind AT&T and ahead of JP Morgan Chase. In 2011, Cargill had revenue of $119.5 billion.

13.     Patricia married JHM III in 1979.  According to her testimony, she believed JHM III to have been married four to six times before marrying her although an opinion by a Minnesota Court of Appeals indicates he had only been married twice.[2] Patricia had three children during the marriage. Andrew, the youngest, was born in 1987.[3] Andrew has testified that although JHM III was not his biological father, which he learned only by reading about the litigation, he treated him like a son.[4] Andrew also made statements to the effect that his mother had no choice but to have children with other men because JHM III was impotent, "[JHM III] new [sic] he was impotent that he had to have my mom have other sperm donors . . . ."[5] JHM III divorced Patricia in 1991.[6] In the divorce settlement, Patricia received a $20 million beachfront house in Hillsboro Beach, Florida, a $2.67 million house in Snowmass, Colorado, and an unknown amount of alimony that ended in 2010.

---

[2]   *Id*. at 225 *compare to* P. MacMillan Dep. Tr. Sep. 24, 2013 24:11-16, Ex. 1.

[3]   *In the matter of the Trusteeship,* 674 N.W.2d at 226.

[4]   A. MacMillan Dep. Tr. Oct. 11, 2012 43:6-10, 44:8-15, Ex. 2.

[5]   Email String, document bearing Bates Nos. PMacMillan128-249, at PMacMillan169 (Dec. 15, 2010), Ex. 3.

[6]   *In the matter of the Trusteeship,* 674 N.W.2d at 227.

**B.      Patricia's Well-Rehearsed Charade: Masking Control as Care.**

14.      Patricia and Andrew have a hostile, tumultuous relationship dominated by her greed and his drug addiction and mental illness.  Family friends and employees have provided sworn statements describing Patricia's constant need for Andrew's money but also her desire to control him and his trusts. During his deposition, in a moment of lucidity, Andrew captured the essence of their relationship:

> A.      My mother has said, "I want total control of you. I want total control of you. I want total control of you." Once -- twice in the same exact place, about 2 feet away of each other in our house, 1125 Hillsboro Mile.
>
> Q.      So my—
>
> A.      And recently over the phone, "I will control you forever." We have recordings, and other people have heard this. "I will control you forever. There's nothing you can do. You're not stronger than me. You're my son and I created you."[7]

15.      By 2010, with her homes mortgaged to the hilt and her alimony running out, Patricia's already substantial demands on UBS for Andrew's trust funds escalated—and UBS complied. By its own admission, as of mid-2010 UBS, which had managed the funds for less than a year, was already paying half of Andrew's monthly budget of $10,000 for living expenses directly to his mother.[8]

---

[7]  A. MacMillan Dep. Tr. Oct. 11, 2012, 30:4-16, Ex. 2.

[8]  Ltr. from UBS to Andrew (Aug. 13, 2010), bearing Bates Nos. Bovino 41531-41534, Ex 4. Patricia's demands for Andrew's trust money did not stop with half his living expenses. As a relatively modest example, between June and August 2010 alone, UBS wired directly to Patricia an additional $9,480.48 for "expenses," including car repairs. Id. On June 24, 2010, July 16, 2010, and July 19, 2010, UBS made payments for cars purchased in Patricia's name, totaling $21,343.53. Id. Patricia testified all of "Andrew's cars" are in her name, and that

16.     At some point, Patricia's concern for her son's health became no more than a rubric for obtaining Andrew's trust funds—and she spread his wealth around: at her direction UBS paid her longtime, unemployed boyfriend, Cyprian Emerson ("Emerson"), $350-a-day to act as Andrew's "sobriety coach"[9] and hired Emerson's mother, "Gabby," not a nurse, to be Andrew's nurse. On more than one occasion, in her presence, Andrew's "sobriety coach" held a gun to Andrew's head and threatened to kill him.  One such incident, described below, became central to this case.

17.     On July 22, 2010, Andrew, frustrated with the control his mother and UBS exerted over his life, executed an Engagement Agreement with David Bovino of David Bovino & Associates, LLC (collectively, "Bovino"), to investigate the fairness of the 2006 Settlement Agreement,[10] which had been quarterbacked by Patricia. But from the start, Andrew made clear that his intention was to separate his financial affairs from his mother and if necessary, UBS.

18.     The same day Andrew signed the Bovino Engagement Agreement, July 22, he emailed UBS to pay Patricia whatever money she was asking for at the moment so she would "shut up" and that all she wanted was "money all the time."[11] Andrew also asked UBS to "stop

---

Andrew . . . doesn't drive much anymore. So I–we drive him around in his cars." P. MacMillan Dep. Tr. Sep. 24, 2013 95:14-24, Ex. 1.

[9]  *See, e.g.*, P. MacMillan Dep. Tr. Sep. 24, 2013 48:2-9, Ex. 1 (explaining that according to Bogenschutz Andrew would only be released from confinement under the supervision of a sobriety coach and that is how Emerson became Andrew's sobriety coach); UBS Account Statement 2012, bearing Bates Nos. 1000-1199, Ex. 111 (monthly payments to a "companion" for Andrew totaling $350/day); Email String (Jun. 12, 2011, Jul. 25, 2011), bearing Bates Nos. UBS 2302-2304, Ex. 123.

[10] *See* Engagement Agreement between A. MacMillan and Bovino (Jul. 22, 2010), bearing Bates Nos. DBovino 962-967, Ex. 5.

[11] Email String, document bearing Bates Nos. UBS20-21, at UBS20 (Jul. 22, 2010), Ex. 7.

talking to my mom cause it just cause problems . . . ."[12] Finally, he threatened to terminate UBS as trustee.[13]

19.     The irony is that Andrew always intended to support his mother.  In August, 2010, Andrew received $4 million that came directly to him from a stock sale outside of his trusts—and gave Patricia $250,000 in cash. But just one month later, she requested that UBS pay an $886.25 auto insurance bill, leaving even UBS executives frustrated, at least back then. Lauren Vagedes ("Vagedes"), financial advisor at UBS Financial Services, complained in an email to Janice Klein, UBS Senior Vice President for Investment ("Klein"), "enough already. Patricia cannot pay anything herself. What did she do before???"[14] "Before," of course, meant before UBS began managing Andrew's funds.

20.     That same month, August, 2010, Andrew notified Klein that he wanted UBS to communicate with Bovino, and only Bovino, regarding all of Andrew's trust matters.[15] UBS reacted nervously to Bovino's representation. In a November 3, 2010, email string in which Andrew forwarded a Bovino invoice to UBS for payment, Vagedes emailed Klein, "Bovino is back."[16] By December, UBS was so far behind in paying Bovino's invoices that Andrew sent an

---

[12] *Id*. at UBS20.

[13] *Id.*

[14] Email String, document bearing Bates No. UBS 121, at UBS 121 (Sep. 10, 2010), Ex. 6.

[15] *See* Email from A. MacMillan to J. Klein, bearing Bates No. UBS55, at UBS55 (Aug. 5, 2010), Ex. 8 ("Please direct all further communications concerning my interests under the Settlement Agreement to Mr. Bovino at: David@BovinoLaw.com.").

[16] Email String (Nov. 3, 2010), bearing Bates No. UBS221, at UBS221, Ex. 9.

email demanding payment and noted that the amount due was seriously outstanding.[17] In that same email Andrew told UBS he was "disgusted in dealing with UBS" because he had been "lied to and manipulated over and over again."[18] On December 16, 2010, Ian Weinstock, UBS Trust's General Counsel ("Weinstock"), emailed Bovino to tell him that "Andrew is clearly not entitled to legal representation as an expense of the trust,"[19] and that any payments for legal representation would be made at the discretion of UBS Trust.[20]

      21.    By the end of that year, her alimony gone, Patricia made clear to UBS her expectations, with no mention of caring for Andrew. On December 9, 2010, she emailed Klein, "I will need some money each quarter [from UBS's distributions to Andrew] think way put it in I have no income from this year on please thanku [sic]."[21] The next day Patricia emailed Klein "I have no income depending on him."[22]

      22.    On December 30, 2010, Andrew emailed Weinstock and Baylor to tell them that Patricia was stealing his weekly cash allocation[23] and that he did not want the Jan Klein Group[24] handling his affairs:

---

[17] *See* Email String from A. MacMillan to UBS (Dec. 3, 2010), bearing Bates Nos. DBovino19-21, at DBovino20, Ex. 10.

[18] *Id.*

[19] Email String (Dec. 16-17, 2010), bearing Bates Nos. DBovino24-29, at DBovino25, Ex. 11.

[20] *Id.*

[21] Email from P. MacMillan to S. Baylor, forwarded to J. Klein (Dec. 9, 2010), bearing Bates No. UBS375, at UBS375, Ex. 14.

[22] Email String (Dec. 9, 2010), bearing Bates No. UBS391, at UBS391, Ex. 15.

[23] *See* Email String (Dec. 30, 2010), bearing Bates Nos. DBovino37-39, at DBovino37, Ex. 12.

[24] *See* http://financialservicesinc.ubs.com/team/thekleingroup/ and http://financialservicesinc.ubs.com/team/thekleingroup/meetourteam.html?start=/team/thekleingroup.

> the jan klein group is to be removed from the situation permanently and we are only to deal with the UBS TRUST COMPANY until the situation is resolved
>
> no one is to be talking to my trustees through my email or through their own, and no on [sic] is to be talking to the jan klein group for any reason at all anymore ever again. the trustees can pass down commands to the jan klein group but other than that the jan klein group will not be contacted by anyone except me and I am not going to either.[25]

"The Jan Klein Group" referred to as "The Klein Group" is the actual designation of Klein and her direct employees within UBS. The next day, Bovino asked UBS for an accounting on Andrew's behalf.[26]  UBS immediately agreed to produce an accounting[27] and never did, not while Bovino represented Andrew.

### C.    Christina MacMillan: Andrew's Wife.

23.    In 2008, Patricia hired Christina Callahan ("Christina"), a high school graduate, as Andrew's tutor. Patricia encouraged Andrew to become romantically involved with Christina and indeed, Christina became pregnant in early 2010. Walter O'Neil ("O'Neil"), Andrew's friend, boat captain, and a certified nurse EMT, provided a sworn statement in which he stated that he found a "handwritten note addressed to Christina from an OBGYN containing instructions to Christina on how to conceive a child after sexual intercourse, such as to elevate the hips."[28] Andrew had told O'Neil that he did not want a child, as he was only twenty-one

---

[25]  Email from A. MacMillan to D. Bovino, D. Craig, P. MacMillan, C. MacMillan. J. Klein, L. Vagedes, and N. Demartini (Dec. 30, 2010), bearing Bates Nos. CMacMillan 33, at CMacMillan33, Ex. 13 (no capitalization in original).

[26]  Ex. 12, at DBovino37.

[27]  Email String (Dec. 31, 2010), bearing Bates Nos. DBovino37-DBovino39, Ex. 12.

[28]  W. O'Neil Aff. (Jun. 22, 2011) at ¶ 7, bearing Bates Nos. CMacmillan328-331, Ex. 16.

years old.[29] Consistent with this statement, Andrew testified that Christina stopped using birth control without his knowledge, "My wife lied about birth control."[30] Just prior to the birth of the child, Patricia and Christina traveled to Las Vegas where Andrew had been on an extended stay. On November 7, 2010, Christina and Andrew, at his mother's insistence and over his objections, married at an off-strip Las Vegas wedding chapel. At the end of December, six weeks after getting married in Las Vegas, Christina gave birth to a son, A.M.

24.     On January 2, 2011, Christina emailed Klein and Vagedes at UBS asking if the trustees had approved "any extra funds regarding the co-payments or the car and insurance payments," as well as whether "the nanny [could] get paid weekly" and "when her first check would be disbursed."[31] The "nanny" turned out to be Christina's mother.[32] Four days later, married less than two months, Christina wrote again, asking that UBS stop depositing money for living expenses in her joint account with Andrew, but rather, deposit it in her sole bank account.[33]

---

[29]  *Id.* at ¶ 7.  O'Neil also swore that Christina and Patricia maintained tremendous control over Andrew's life and would hire people to follow him around—and "isolate Andrew in order to prevent him from communicating with other friends in an effort to control him, so that he is not influenced by anyone but them."  *Id.* at ¶¶ 4-10.

[30]  A. MacMillan Dep. Tr. Oct. 11, 2012 42:14, <u>Ex. 2</u>.

[31]  Email from C. MacMillan to L. Vagedes & J. Klein (Jan. 2, 2011), bearing Bates No. DBovino474, at DBovino474, <u>Ex. 17</u>.

[32]  *See* Email String (Aug. 20, 2012), bearing Bates Nos. UBS2318-19, at UBS2318, <u>Ex. 18</u>; Email String (Jan. 6, 2011), document bearing Bates Nos. UBS509-510, at UBS509, <u>Ex. 19</u>.

[33]  *See* Email from C. MacMillan to L. Vagedes (Jan. 6, 2011), bearing Bates Nos. UBS494, at UBS494, <u>Ex. 20</u>.

> **D.** **Defendants, along with Patricia and Christina, Unite Against Bovino: Patricia, Christina, and UBS Hack into Andrew's Account, Create a Phony Email Address, And Divert Attorney-Client Communications; a Minneapolis Lawyer Enters the Conspiracy.**

25.     By at least January 4, 2011, Andrew had become serious about removing UBS as trustee and sent Bovino an email addressing that issue, telling him to "quit letting [UBS] beat [them] in th einformation [sic] game . . . and timing game . . . sue them immediately … UNS [sic] TRUST CO to be removed immediately. . . ."[34] There was a reason Bovino was behind the curve: Christina and Patricia had already begun hacking into Andrew's attorney-client privileged and confidential emails and sharing their contents with UBS.

26.     Multiple events that are at the heart of this lawsuit happened almost simultaneously in January. On January 4, 2011, Klein emailed Seane Baylor, UBS Certified Trust and Financial Advisor: "[w]e do have some serious issues. Can you email us with any details of your call with Bovino[?]"[35] And in that same email, Klein told Baylor that she would "**try to get [Baylor] a copy of the email [Bovino] sent Andrew**."[36]

27.     On January 6, 2011, in an email, Klein advised Baylor that "[she] had an interesting conversation with Morris Sherman."[37] Morris Sherman is a partner with the law firm of Leonard Street and Deinard in Minneapolis, Minnesota and represented Patricia and Andrew's two older brothers (but not Andrew) in connection with the family litigation they'd brought that

---

[34]   Email from A. MacMillan to D. Bovino (Jan. 4, 2011), document bearing Bates No. DBovino40, at DBovino40, Ex. 21.

[35]   Email String (Jan. 4, 2011), bearing Bates Nos. UBS485-486, at UBS485, Ex. 22.

[36]   *Id*. (emphasis added).

[37]   *See* Email from J. Klein to S. Baylor (Jan. 6, 2011), bearing Bates No. UBS494, at UBS494, Ex. 20.

ended with the 2006 Settlement Agreement. Under the trust instruments, removing and replacing

a trustee requires the consent of a partner or shareholder attorney from Leonard Street and

Deinard.  Thus, realizing that it was in danger of being replaced as trustee, UBS went straight to

one of the very people with authority to ultimately decide its fate.

     28.     Given the clear conflict of Sherman representing and/or advising UBS in its effort

to eliminate Bovino, Sherman and UBS arranged for Timothy D. Kelly, a lawyer with the

Minneapolis firm Kelly and Hannah, P.A. f/k/a Timothy D. Kelly, P.A. (collectively, "Kelly"), to

assist in preventing the trust fund from being transferred out of UBS. Klein, in her deposition,

testified that Morris Sherman referred Kelly to Christina.[38] However, Christina testified that both

UBS *and* Morris Sherman referred her to Kelly.[39] In addition, although Klein's deposition

testimony is that Kelly never represented UBS, Christina's testimony is that Kelly invoiced UBS

for work he did not perform for Christina.[40] In fact, as will become clear, Kelly invoiced for

work he was doing for UBS—and under the guise of his acting as Cristina's and her son's,

"A.M.'s" lawyer, UBS paid him from the trusts.

     29.     Also early in January, Bovino wrote an email to Andrew regarding Andrew's

concerns over "continuing [his] marriage to [his] wife, [Chris]tina."[41] On or about the same day,

---

[38] *See* J. Klein Dep. Tr. Mar. 28, 2013 34:1-3, Ex. 23.

[39] *See* C. MacMillan Dep. Tr. Mar. 27, 2013 60:8-10, Ex. 24.

[40] *Compare* J. Klein Dep. Tr. Mar. 28, 2013 34:6-7, Ex. 23 *with* C. MacMillan Dep. Tr. Mar. 27, 2013 67:19-68:11, Ex. 24.

[41] Email from D. Bovino to A. MacMillan (Jan. 7, 2011), bearing Bates Nos. Bovino06530-06531, at Bovino6350 (C. MacMillan Dep. Ex. 1), Ex. 25.

Christina read the email.[42]

30.     During one of Bovino's phone conversations with Baylor, she admitted that in fact, Klein funneled information about Andrew to UBS Trust via Patricia.[43] Immediately on January 14, 2011, Bovino warned Andrew of that fact.[44] Bovino added, "Don't say anything to anyone. We need to discuss."[45] The subject line of those emails read "A/C PRIV/CONFIDENTIAL."[46] That email chain was forwarded by either Christina or Patricia to Patricia's email address.[47] And from there, to Klein at UBS.[48]

31.     By the end of January, Patricia and Christina had a system in place: hack into Andrew's account, retrieve email communications with Bovino, and forward them to Klein and others at UBS, who then forwarded the emails to Kelly nearly immediately. But whatever had begun in January 2011 became far more pernicious in February 2011.

32.     First, on February 2, 2011, Bovino sent an email to Andrew with the subject line "CONFIDENTIAL; ATTORNEY-CLIENT PRIVILEGED – UBS REMOVAL AND REPLACEMENT," transmitting a memo on the necessary steps to remove and replace UBS as

---

[42] *See* C. MacMillan Dep. Tr. Mar. 27, 2013 11:2-11 (discussing C. MacMillan Dep. Ex. 1), Ex. 24.

[43] Email String (Jan. 14, 2011), bearing Bates No. UBS526, at UBS526, Ex. 26.

[44] *Id*.

[45] *Id*.

[46] *Id*.

[47] *Id*.

[48] *Id*.

trustee.[49] The same day, Christina forwarded this email to Patricia.[50] Also on February 2, 2011, UBS made its last payment (of $37,111.36) to Bovino for his representation of Andrew. Subsequently, based in part on instructions from Kelly and Patricia, UBS refused to pay additional invoices from Bovino. Conversely, UBS "exercised its discretion" to regularly pay attorneys who assisted Christina and Patricia in their efforts to terminate Bovino's relationship with Andrew and maintain control over Andrew's trusts.

33.     On February 7, 2011, Andrew advised Bovino that Christina had gained access to Andrew's e-mail account and to stop her, changed his password—and believed that his account was once again secure. But he was wrong. Throughout the remainder of February 2011 and beyond, Christina and/or Patricia continued to steal virtually every attorney-client email between Bovino and Andrew, most of which discussed replacing UBS with a successor trustee—and forwarded them to Klein and others at UBS. Included in these emails was substantial correspondence between Bovino and Andrew concerning retaining the law firm of Akin, Gump, Strauss, Hauer and Feld ("Akin") to assist them in their efforts. Also included in these emails was the Request for Proposal (the "RFP") that Bovino submitted to numerous potential successor trustees. Christina stole multiple emails regarding the RFPs. These attorney-client emails were forwarded to UBS and from there to Kelly—an attorney himself.[51]

---

[49] Email String (Feb. 2, 2011), bearing Bates No. PMaCMillan186-187, at PMacMillan186, Ex. 27.

[50] *Id.*

[51] *See, e.g.,* Email String (Feb. 26, 2011), bearing Bates Nos. CMacMillan127-129, Ex. 28 (Christina forwarding an email from Bovino to Andrew about sending Part II of the Request for Proposal to potential trustees), Email String (Feb. 28, 2011), bearing Ref. No. UBS_33-5507, Ex. 29 (email discussing RFP forwarded from Andrew's account to J. Klein and then to T. Kelly); Email String (Mar. 6-7, 2011), bearing Ref. No. UBS_39-5607, Ex. 30 (email from

34.   Between February 16 and 18, 2011, Bovino emailed Andrew at least four times

regarding the 2006 Settlement Agreement.[52] During those days, Christina forwarded each of

these emails, as well as older ones on the same topic, to Patricia and/or Klein at UBS.[53] On

February 16, Bovino sent an email to Andrew discussing the purpose of a meeting with Akin to

discuss challenging the 2006 Settlement Agreement.[54] That email was forwarded to Patricia

within hours.[55] Early on the morning of February 17 (1:51 am), the email was forwarded from

Patricia's inbox to Klein's.[56] Two days later, that same email was forwarded from Klein to

Kelly.[57] But on this email string, in a misguided attempt to create some sort of plausible

deniability, the headers showing that the email went through Patricia's inbox in order to reach

Bovino to Andrew with the draft RFP for a successor trustee forwarded from J. Klein to T. Kelly—the header indicating how the email went from Andrew's inbox to J. Klein's is missing); Email String (Mar, 6, 2011), bearing Bates Nos. UBS636-637, Ex. 31 (forwarding same communication between Bovino and Andrew as UBS_39-5607 but indicating that the email was forwarded to Christina's inbox, then from Christina to Klein, and then from Klein to Kelly).

[52]  *See, e.g.,* Email String (Feb. 16, 2011), bearing Bates Nos. PMacMillan153-154 (labeled C. MacMillan Dep. Ex. 7), Ex. 32; Email String (Feb. 18, 2011), bearing Bates Nos. CMacMillan47-48, Ex. 33; Email String (Feb. 18, 2011), bearing Bates Nos. UBS586-587 (designated J. Klein Dep. Ex. 87) Ex. 35; Email String (Feb. 16, 2011), bearing Bates Nos. DBovino1120-1122, Ex. 36.

[53]  *Id.;* Email String (Feb. 18, 2011), Ref. No. UBS_028-5401 (bates Nos. DBovino349-350 & labeled J. Klein Dep. Ex. 85), Ex. 34 (forwarding a December 8, 2010 email re: the 2006 Settlement Agreement); Email String (Feb. 18, 2011), bearing Bates Nos. CMacMillan73-78 (forwarding a January 2011 email regarding the 2006 Settlement Agreement), Ex. 40.

[54]  *See* Email String (Feb. 16, 2011), bearing Bates Nos. PMacMillan153-154 (labeled C. MacMillan Dep. Ex. 7), Ex. 32.

[55]  *Id*.

[56]  Email String (Feb. 16-17, 2011), bearing Ref. No. UBS_024-5339 (labeled C. MacMillan Dep. Ex. 13), Ex. 37.

[57]  Email String (Feb. 16, 18, 2011), bearing Ref. No. UBS_026-5378 (labeled J. Klein Dep. Ex. 84), Ex. 38.

Klein's are gone. Klein's explanation for the disappearing headers, during her deposition, was that she does not know how it happened and she would not know how to delete a header, "I can forward it, but I don't know how the other header was taken out."[58]

35.    On February 17, 2011, Bovino sent Andrew a letter amending their July 22, 2010, engagement letter.[59] The letter, the related co-counsel fee sharing agreement with Akin, the retainer statement, and Andrew's engagement letter with Akin were forwarded from Andrew's inbox to Christina's AOL email address that day and from there to Klein and Vagedes.[60] On February 18 Bovino also sent another email to Andrew that referenced Morris Sherman and Patricia's involvement in the 2006 Settlement Agreement.[61] Christina forwarded this email to Klein and Vagedes on February 18, 2011.[62]

36.    On February 18, 2011, Klein forwarded one of the stolen emails to Kelly.[63] In response, Kelly replied that his "paralegal did a little snooping on Bovino . . . I will call next week."[64] Indeed, Kelly's billing records indicate that he had a conference with his paralegal that very day "re[garding] Bovino."[65] But apparently, as also indicated by his billing records, Kelly's

---

[58] J. Klein Dep. Tr. Mar. 28, 2013 35:21-25 (discussing J. Klein Ex. 84), Ex. 23.

[59] Amended Engagement Agreement (Feb. 17, 2011), bearing Bates Nos. DBovino 962-967, Ex. 5.

[60] C. MacMillan Dep. Ex. 14, Ex. 39.

[61] *See* Email String (Feb. 18, 2011), bearing Bates Nos. CMacMillan73-78 (forwarding a January 2011 email regarding the 2006 Settlement Agreement), Ex. 40.

[62] *Id.*

[63] Email String (Feb. 18, 2011), bearing Bates Nos. UBS586-588 (forwarding a Dec. 8, 2010 email), Ex. 35.

[64] *Id.*

[65] Kelly and Hannah Invoice (Feb. 28, 2011), bearing Bates Nos. UBS661-664, Ex. 41.

"snooping" "regarding Bovino" was important enough that he chose to call UBS that same day instead of the following week.[66]

37.      Next, in a February 23, 2011, email string, Bovino advised Andrew that "UBS will be removed, at your request. The wheels are in motion, it's critical that we get an LOI [Letter of Intent] from successor trustees to preempt future discord."[67] Sixteen minutes later, Andrew replied that he would give Bovino "a million if [Bovino] g[ot] it done in a month."[68] Thirty-six minutes after Andrew's reply, Christina forwarded this email to her AOL email address, and five minutes later forwarded this email to Klein and Vagedes at UBS, adding "Ughhh I am so furious about this situation."[69]

38.      Later that same day, Bovino submitted a "Demand for Accounting and Inventory" to Baylor at UBS, requesting an accounting no later than March 7, 2011.[70] Also that same day, Bovino emailed Andrew with an update on his efforts to remove UBS and his advice on how the removal of UBS should be managed:

> I am working on the RFP documents and plan to get those to you for your review by the end of the week. I am also working on a list of potential successor corporate trustees. My thought has been to send out the RFP before we approach UBS about resigning. Once we talk to UBS, the cat is out of the bag and, no doubt, your mom will be promptly advised. I cannot see her taking a potential change in trustee casually since it would appear she has some current influence over UBS. I had been thinking that once we

---

[66] *Id.*

[67] Email String, (Feb. 23, 2011), bearing Bates Nos. CMacMillan101-103, at CMacMillan 102-103, Ex. 42.

[68] *Id.* at CMacMillan 101.

[69] *Id.*

[70] *See* Ltr. from Bovino to S. Baylor (Feb. 23, 2011), bearing Bates Nos. CMacMillan436, at CMacMillan436.

obtained an accounting and an inventory of trust assets from UBS and we had proposals from potential successors, we will approach UBS about resigning. **I really think UBS should be the last to hear that we want them to resign** so the opportunity for a vacuum is minimized as is the opportunity for outside influences in the whole selection process.[71]

A few minutes later, Christina also forwarded this email—certainly not information Andrew or Bovino would want circulated to anyone—to her AOL email address and to Klein and Vagedes at UBS.[72] Although Bovino was clearly unaware that the cat was already out of the bag—UBS now knew that Andrew's threat to replace UBS was serious.

39.     At this point, Kelly began researching ways to attack Bovino. Kelly's billing invoices for February 23 and 24, 2011, reveal that Kelly and his firm were researching claims on behalf of UBS "against third party for **tortiously interfering with trust agreement** by inducing **beneficiary breach**" and even drafted a memo regarding such a claim.[73] Thus, while Kelly was receiving stolen emails containing privileged communications between Bovino and Andrew from UBS, in real time, regarding Andrew's removal of UBS as trustee, Kelly's firm was researching whether UBS could sue Bovino for tortious interference. Combined, attorneys with Kelly's firm spent more than eighteen hours researching, writing, and discussing UBS's ability to sue Bovino for tortious interference.[74] And a review of Kelly's billing records for the month of February 2011 further reveal that he and his firm were in constant communication with Klein and Vagedes

---

[71] Email String (Feb. 23, 2011), bearing Bates Nos. CMacMillan106-108, at CMacMIllan106, Ex. 44 (Emphasis added.).

[72] *Id*.

[73] Kelly and Hannah, P.A. Invoice (Feb. 28, 2011), bearing Bates Nos. UBS661-664, at UBS662, Ex. 45 (emphasis added)

[74] *See generally id.*

at UBS and also had telephone conversations and a meeting with Morris Sherman, the partner in the Minneapolis law firm that was required to consent to a change in trustees—and the man behind Kelly's hiring.[75]

40.     On February 23, 2011—at the height of email communications regarding removing UBS as trustee and Andrew's desire to divorce Christina—Christina had Andrew arrested on a domestic violence charge in Florida. According to O'Neil, Christina admitted to him that "she only filed domestic violence charge because she knew Andrew was potentially filing for divorce and she wanted to create a 'record' to support her case in any such proceeding."[76] As discussed below, UBS, through Kelly, would later use Christina's charge to further their tortious conspiracy.

41.     On February 25, 2011, Baylor responded to Bovino's demand for an accounting, stating that the March 7, 2011, deadline was too aggressive and that UBS would provide the accounting by late April,[77] which never happened, at least not while Bovino represented Andrew. The same day, Bovino forwarded Baylor's email to Andrew, explaining that "we need this accounting to entertain proposals from the prospective money managers."[78] The next day, Christina stole this email and forwarded it to Klein, who forwarded it to Baylor.[79] At that point someone at UBS again deleted the header indicating that the email came through Christina's

---

[75] *Id.* (communications with M. Sherman or M. Sherman's office on Feb. 22, 25, and 26).

[76] W. O'Neil Aff. (Jun. 22, 2011), at ¶ 16, bearing Bates Nos. CMacMillan328-331, <u>Ex. 16</u>.

[77] *See* Email String (Feb. 25, 2011), bearing Bates Nos. Bovino39751-39752, at Bovino39751, <u>Ex. 46</u>.

[78]  *See* Email String (Feb. 25-26, 2011), bearing Bates Nos. CMacMillan127-129, at CMacMillan128-129, <u>Ex. 28</u>.

[79] *Id.* at CMacMillan127.

inbox and Klein then forwarded the email to Kelly.[80]

42.     The fact is, with or without a header, there was no doubt from the content and the parties sending and receiving the emails that this was an attorney-client communication. Nor could anyone who read them doubt that they had broken the law, based on the warning on the bottom of the email alone:

> This e-mail message (and/or documents accompanying it) is intended for the use of the individual or entity to which it is addressed, and may contain information that is PRIVILEGED, CONFIDENTIAL . . . . If the reader is not the intended recipient . . . you are hereby notified that any dissemination, distribution, or copying of this communication is strictly prohibited. **If you received this message in error and are an attorney or law firm, consult Title I of the Federal Electronic Communications Privacy Act of 1986, which requires you refrain from examining these materials.** If you received the communication in error, please contact us immediately by telephone to arrange return of the communication.[81]

43.     Neither Patricia, Christina, UBS, nor Kelly were in any way deterred by the warning in the Bovino footer. One notable example is a March 25, 2011 email between Kelly and Klein.[82] Kelly asks Klein if she still has a document that Christina sent them.[83] Kelly adds that the email is where "Bovino told Andrew . . . ."[84]

44.     Early in March 2011, Andrew decided that he was ready to enter drug rehabilitation and sought Bovino's assistance to get him into a facility. Bovino commenced

---

[80] *See* Email String (Feb. 23-28, 2011), bearing Ref No. UBS_033-5507 (labeled J. Klein Dep. Ex. 89), Ex. 47.

[81] *Id.* (emphasis added).

[82] Email String (Mar. 25, 2011), document bearing Bates Nos. UBS804-805, at UBS804, Ex. 48.

[83] *Id.*

[84] *Id.*

discussions with a well-regarded facility capable of handling both mental health and substance abuse issues, called Crossroads, founded by the British singer Eric Clapton, in Antigua.[85] The obvious problem was that for Andrew to enter rehabilitation, he needed UBS's approval to fund the effort. Bovino assisted Andrew by lending him funds to attend Crossroads in case UBS refused to disburse the funds necessary.[86] But that was not the only obstacle standing in Andrew's way. Andrew had pending drug charges in Florida and also needed the judge's permission to travel to Antigua.[87] Andrew's criminal defense attorney, Bogenschutz, filed a motion seeking permission for Andrew to leave the country and a hearing was scheduled for March 18, 2011.[88] Rather than assist Bovino's efforts to get Andrew care he both was seeking and needed, Defendants, along with Christina and Patricia, escalated their efforts to keep Bovino from helping Andrew—by making certain his bond was revoked and that he was sent to jail and not to Crossroads.

     45.     On March 2, 2011, Andrew informed Bovino that his email had been hacked,[89] but that he had changed his passwords again and that his e-mail was once again secure. Again, he was wrong.

     46.     During her deposition, Christina claimed that Andrew provided her with his

---

[85] Email from Crossroads Admissions to S. Baylor and Bovino (Mar. 16, 2011), bearing Ref. No. UBS_053-5800 (describing Crossroads), Ex. 49.

[86] Email String (Mar. 15, 2011), bearing Bates Nos. CMacMillan165-166 (labeled C. MacMillan Dep. Ex. 29), Ex. 50.

[87] Hr'g Tr. *State of Florida v. MacMillan*, Cause No. 09-004808CF10-A (Fl. Cir. Ct. Mar. 18, 2011), Ex. 51.

[88] *Id*. at 2:13-3:5.

[89] Emails between Bovino and A. MacMillan Re: Compromised Email (Mar. 2, 2011), bearing Bates Nos. DBovino56, at DBovino56 Ex. 121.

password and that she had permission to read his emails.[90] This statement is inconsistent with the fact that she forwarded emails to Patricia and UBS that Andrew and David would never have wanted read by anyone but themselves. Andrew himself states, in an October 15, 2012, sworn affidavit—executed during a period of sobriety—that he never gave his wife or his mother his password or permission to read his emails, much less forward them to UBS, disclosing the details of his plans to replace it as trustee:

> I never authorized my mother or wife to access my email account or to intercept, read or use my attorney-client communications with Mr. Bovino. I especially did not want my communications with him concerning procedures for removing and replacing UBS Trust with another institutional trustee to be disclosed to UBS.[91]

Nor are Christina's claims consistent with Andrew's multiple attempts to create a secure password each time he discovered the hacking.

### E.   Christina creates a phony Bovino web address to undermine Bovino with Andrew; UBS independently unlawfully undermines Bovino.

47.   "Furious about the situation," as she put it to UBS, Christina had taken the scheme to interfere with Bovino's and Andrew's attorney-client relationship even further. Specifically, a bit earlier than some of the events above, on the evening of February 24, 2011, Christina registered the domain name "www.bovinolaw.net," using her husband's name, and also set up an email account using a person's first name followed by "@bovinolaw.net."[92] Bovino used his "david@bovinolaw.*com*" e-mail address to communicate with Andrew, sending

---

[90] C. MacMillan Dep. Tr. Mar. 27, 2013 26:21-27:3; 27:20-28:6, Ex. 24.

[91] A. MacMillan Aff. (Oct. 15, 2012) (labeled as C. MacMillan Dep. Ex. 70), at 2:6-10, Ex. 52.

[92] Order Confirmation for Registration of Domain www.bovinolaw.net (Feb. 24, 2011) (labeled as C. MacMillan Dep. Ex. 20), Ex. 53; C. MacMillan Dep. Tr. Mar. 27, 2013 35:11-36:16, Ex. 24.

numerous confidential documents, attorney work product, drafts of legal documents, legal strategies, and other materials associated with Bovino's representation of Andrew, who established a confidential password protected e-mail address with America Online (the "AOL e-mail account") as the sole e-mail address he used in his electronic communications with Bovino and other employees and attorneys at the Law Firm of David A. Bovino P.C.

48.     During her deposition, Christina admitted that she created and used the bovinolaw.net account to "monitor" Andrew's communications with Bovino.[93] More candidly, Christina admitted that she wanted to "stop communication" between Bovino and Andrew and that she wanted to cut Andrew off from Bovino.[94] This is consistent with O'Neil's affidavit that Christina and Patricia engaged in surveillance of Andrew's activities and tried to isolate him.[95] In this case, Christina would intercept emails from Bovino, paste them into a bovinolaw.net email, delete them from Andrew's "Sent" box, and send them to Andrew from david@bovinolaw.net.[96]

49.     On March 9, 2011, Christina intercepted an email from Bovino to Andrew regarding Bovino's efforts to replace UBS, copied it into an email from bovinolaw.net, deleted it from Andrew's email account, edited the contents, thereby impersonating Bovino, and then sent it to Andrew.[97] Although during her deposition Christina admitted sending Andrew emails from david@bovinolaw.net while impersonating Bovino, she initially emphatically denied altering the

---

[93] C. MacMillan Dep. Tr. Mar. 27, 2013 166:10-16, Ex. 24.

[94] C. MacMillan Dep. Tr. Mar. 27, 2013 33:6-20, Ex. 24.

[95] W. O'Neil Aff. (Jun. 27, 2011), at ¶¶ 5-9, bearing Bates Nos. CMacMillan589-592, Ex. 16.

[96] C. MacMillan Dep. Tr. Mar. 27, 2013 27:20-28:3; 34:12-19, Ex. 24.

[97] C. MacMillan Dep. Tr. Mar. 27, 2013 56:15-58:8, Ex. 24.

emails, testifying under oath that she "never changed anything."[98] But under further questioning, and faced with the evidence, she finally admitted that she did doctor some of the emails, posing as Bovino.[99]

50.   In fact, Christina doctored the March 9, 2011, email.[100] First, she added a demand for payment on the bottom of the email, unaware that by then UBS had made its (last) payment to Bovino.[101] Second, Christina added a sentence to the effect that removing UBS as trustee was going to be difficult, "it isn't going to be as easy as I thought to remove UBS and it's going to—to take some significant time unless they resign willingly like Bank of America did."[102] Obviously this altered advice was designed to portray Bovino as greedy and weak to undermine Andrew's faith in his lawyer.

51.   During this time, UBS was also independently trying to undermine Bovino by looking for dirt on him. Vagedes emailed Klein on March 10, 2011, with the message "interesting articles on Bovino" and forwarding several Internet links, some of which were in fact about Bovino and others which were about another "David Bovino."[103] The articles about Bovino recounted his ordeal at the hands of three armed gunmen in South Africa who shot him, and his then South African fiancée, who was and remains paralyzed, during a home invasion in

---

[98] *Id.* at 54:13-19.

[99] *Id.* at 56:7-58:15.

[100] *Id.* at 56:7-58:15.

[101] *Id.* at 57:1-9.

[102] *Id.* at 57:23-58:15 (discussing Email from C. MacMillan impersonating D. Bovino to A. MacMillan, bearing Bates Nos. Bovino36076-36098 (Mar. 16, 2011), at Bovino36076 (Mar. 9, 2011) (labeled C. MacMillan Dep. Ex. 36), <u>Ex. 54</u>).

[103] Email from L. Vagedes to J. Klein (Mar. 10, 2011), bearing Bates Nos. UBS670, <u>Ex. 55</u>.

2006.[104] One of the articles was about a gunrunning David Bovino—not this David Bovino—indicted in the U.S. District Court of San Jose for gun trafficking.[105]

52.     It is undisputed that Bovino's confidential and privileged emails were being stolen, in real time, by Christina and Patricia, who forwarded them to Klein at UBS, who then, according to Klein's own deposition testimony, forwarded them to Kelly as a matter of course:

> Q.     Right. As matter of course, you were getting this information from Christina and you were turning around and forwarding it back to Christina's lawyer; is that correct?
>
> A.     It appears so.[106]

53.     In fact, Christina forwarded a slew of emails from Andrew's account to herself and to Patricia, which were then usually forwarded to UBS.[107] In addition, Klein's having

---

[104]   *Id*. (citing http://www.iol.co.za/news/south-africa/court-hears-of-staples-scars-and-trauma-1.405728).

[105] *Id*.
(http://www.justice.gov/usao/can/press/2008/2008_09_19_lopez.jasso.bovino.songer.guiltyplea.press.html).

[106] J. Klein Mar. 28, 2013 Dep. Tr. 39:7-12, Ex. 23 (objection omitted). *See also* J. Klein Mar. 28, 2013 Dep. Tr. 34:23-35:2; 37:15-18; 39:2-3, Ex. 23 (admitting individual instances of forwarding to Kelly).

[107]   *See, e.g.*, Email String (Jan. 21-22, 2011), bearing Bates Nos. CMacMillan34-36, Ex. 56 (forwarding an email from UBS discussing the 2011 budget), Email String (Feb. 18, 2011), bearing Bates Nos. CMacMillan47-48, Ex. 57 (forwarding an email containing the engagement letter between Andrew and Akin, sent to Andrew for review and signature), Email String (Feb. 18, 2011), bearing Bates Nos. CMacMillan 73-78, Ex. 58 (forwarding a discussion between Bovino and Andrew about the 2006 Settlement Agreement, Patricia's possible involvement in getting a law firm a "sweetheart deal" at the settlement, and legal strategy), Email String (Feb. 26, 2011), bearing Bates Nos. CMacMillan 127-129, Ex. 59 (forwarding Bovino's email to Andrew explaining that they needed an accounting from UBS to entertain proposals, and explaining the process of replacing UBS as trustee), Email String (Mar. 6, 2011), bearing Bates Nos. CMacMillan 133-134, Ex. 60 (forwarding an email between Andrew and Bovino discussing the draft Request for Proposal to be circulated to potential trustees to replace UBS), Email String (Mar. 13, 2011), bearing Bates Nos.

forwarded stolen emails to Kelly, as well as Christina's own emails, is clearly indicative of who

Kelly's real client was. Unsurprisingly, Christina never emailed Klein, her lawyer, directly—and

as late as March 16, 2011, Kelly's administrative assistant emailed Klein asking her to forward a

certain document to Christina because Kelly's firm didn't "have any contact information for

her."[108]

---

CMacMillan 159, Ex. 61 (forwarding the proposed Power of Attorney Bovino had drafted for Andrew, *which Andrew never received*), Email String (Mar. 15, 2011), bearing Bates Nos. CMacMillan 164-166, Ex. 62 (forwarding an email from Bovino's office to Andrew regarding a promissory note), Email String (Oct. 26, 2011), bearing Bates Nos. PMacMillan45, Ex. 63 (forwarding email from Bovino to Andrew in response to receiving the First Amended Complaint in the guardianship proceedings, discussing the ramifications of guardianship, and encouraging Andrew to stand up for himself despite Defendants' efforts to neutralize him, to Patricia), Email String (Feb. 26, 2011), bearing Bates Nos. UBS620, Ex. 64 (forwarding email from Bovino to Andrew discussing replacement of UBS as trustee and Requests for Proposals to potential candidates), Email String (Mar. 15, 2011), bearing Bates Nos. UBS685-686, Ex. 65 (forwarding email from David to Baylor regarding getting UBS to disburse funds for Andrew's benefit), as well as J. Klein Dep. Ex. 86 (Feb. 18, 2011), Ex. 66 (forwarding email from Bovino to Andrew summarizing the terms 2006 Settlement Agreement and providing legal analysis thereof to UBS and then to T. Kelly), J. Klein Dep. Ex. 130 (Dec. 9, 2010), Ex. 67 (forwarding email from Bovino to Andrew about attacking the validity of the 2006 Settlement Agreement, to Patricia), C. MacMillan Dep. Ex. 5 (Feb. 2, 2011), Ex. 68 (forwarding an email from Bovino to Andrew with a memo detailing the steps to replace UBS as trustee), C. MacMillan Dep. Ex. 10 (Feb. 18, 2011), Ex. 69 (forwarding an email from Bovino to Andrew providing Andrew with a memo regarding trust administration), C. MacMillan Dep. Ex. 13 (Feb. 18, 2011), Ex. 70 (forwarding an email from Bovno to Andrew discussing the Akin retention and strategy for challenging the 2006 Settlement Agreement), C. MacMillan Dep. Ex. 15, Ex. 71 (forwarding email from Bovino to Andrew asking him to review a memo regarding Andrew compelling UBS to pay his attorneys fees), C. MacMillan Dep. Ex. 16, Ex. 42 (emails between Bovino and Andrew discussing UBS's removal as trustee), C. MacMillan Dep. Ex. 17 (Feb. 23, 2011), Ex. 44 (forwarding email from Bovino to Andrew telling him Bovino is working on Request for Proposal to replace UBS and that UBS should not be approached until the very end). This list is not exhaustive.

[108]  Email from J. Zimmerman at Kelly and Hannah, P.A. to T. Kelly (Mar. 16, 2011), bearing Ref. No. UBS 049-5785, Ex. 95.

F.   **Defendants, along with Christina and Patricia's Efforts to Isolate Andrew Escalate to Include Andrew's Incarceration Rather than Treatment in a Rehabilitation Facility of His Choice.**

54.   Instead of helping Andrew by assisting his efforts to attend drug rehabilitation, UBS and Kelly orchestrated Andrew's incarceration. This was purportedly Christina's wish, at least as communicated by Klein to Kelly: "Christina still feels the best course of action is to get his bond revoked and get him committed through the courts."[109] On March 14, 2011, Klein wrote to Kelly, "we'll have to count on your letter [about the domestic abuse charge] to the judge for Christina to revoke bail."[110] In advance of the hearing, Kelly, who communicated with his clients primarily through Klein, communicated with *Andrew's lawyer,* Bogenschutz, multiple times to gather information about Andrew's case and to persuade Bogenschutz to go along with UBS and Kelly's plan to have Andrew's bond revoked, thereby preventing him from leaving the country or attending the treatment facility that had already accepted to take him.[111]

55.   On March 10, 2011 Klein emailed Kelly asking if he had made "any progress speaking with Bogenschutz."[112] The next day, Kelly replied that he had not heard back from Bogenschutz.[113] Later that same day, Kelly emailed Klein, stating that he was not "doing a good job pressing Bogenschutz but he is a crafty character."[114] Kelly assured Klein he would "keep

---

[109] Email from J. Klein to T. Kelly (Mar. 14, 2011), bearing Bates Nos. UBS707-711, at UBS709, Ex. 72.

[110] *Id.* at UBS708.

[111] *See generally, id.*

[112] *Id.* at 710.

[113] *Id.*

[114] *Id* at UBS709.

pressing him."[115]

56.     In the meantime, Andrew and Bovino were working to maximize Andrew's

chances of getting help for his substance abuse and mental health issues. Because Andrew

believed that he would be largely unavailable during much of his six-month inpatient treatment,

he discussed with Bovino the need for Bovino to have authority to continue to deal with UBS

and to carry out his business and legal affairs in Andrew's absence.[116] To that end, on March 11,

2011, an attorney from Bovino sent a draft of the Power of Attorney for Andrew to sign, in final

form, ready for execution and notarization.[117] Andrew did not receive that POA. The people who

*did* receive the POA were Christina, Patricia, Vagedes, and Klein. On March 13, 2011, Christina,

again, gained unauthorized access to Andrew's email account and forwarded it to her account.[118]

From her account, Christina then sent the email to UBS.[119] As a result, UBS, Christina and

Patricia were—once again—one step ahead of Bovino and Andrew, thanks to their illegal

accessing, use, possession, and intercepting of Bovino's emails.[120]

57.     Three days later, on March 14, 2011, Kelly emailed Klein at UBS to inform her

that he had spoken with Bogenschutz, who told Kelly that Andrew was scheduled to meet with a

---

[115] *Id.*

[116] Andrew had first discussed the POA as early as August 5, 2010, when Bovino time records
reflect this associate drafted a POA ". . . for D. Bovino to act on Client's behalf for issues
related to trusts." September 1, 2010, Invoice from Bovino to A. MacMillan, at Aug. 5, 2010,
entry, Ex. 73.

[117] *See* Email String (Mar. 13, 2011), bearing Bates Nos. CMacMillan159, at CMacMillan159,
Ex. 61.

[118] *Id.*

[119]  *Id*.

[120] *Id.*

psychiatrist that day.[121] In addition, Kelly reiterated that he was planning on submitting a letter to the judge requesting that Andrew's bond be revoked. It was clear that it was not just Kelly, or even Christina, who wanted Andrew's bond revoked.[122] On March 14, 2011, Klein emailed Kelly and stated, "Thank you so much for this. … *We'll* have to count on your letter to the judge" to revoke Andrew's bond.[123] And the next day, Klein emailed Kelly to relay a conversation with Patricia, who told Klein that Patricia had spoken with Bogenschutz and had asked Bogenschutz to not let Andrew leave the country to attend rehabilitation.[124] Klein told Kelly that Bogenschutz's response "was that he had to get Andrew out of the country because we [UBS and Kelly] were pulling the bond and he's Andrew's attorney."[125] At that point, Bogenschutz was doing what he should: representing Andrew's best interests.  Indeed, an hour later, Kelly replied to Klein, stating that "[w]e need to keep the pressure on and getting the judge and prosecutor involved is the best way to do it."[126]

58.    The next day, March 15, 2011, was a pivotal day in Defendants, along with Christina and Patricia's scheme to end Bovino's A/C relationship with Andrew. By that date, Andrew knew that his email was compromised although he did not yet know that one of the ways it was compromised was the bovinolaw.net account created by his wife. On March 15, 2011, Andrew emailed Baylor at UBS (unaware of Baylor's participation) and told him that his

---

[121] *See generally* Email String (Mar. 14, 2011), bearing Bates Nos. UBS707-711, Ex. 72.
[122] *Id.*
[123] *Id.*  (emphasis added).
[124] *Id.* at UB707.
[125] *Id.*
[126] *Id.*

email was compromised and all distributions for Andrew to go to Crossroads would have to go to Bovino.[127] Andrew cc-ed the bovinolaw.net account in that communication, still unaware it was not Bovino's actual account.[128] Although Andrew only mentioned that *his* email had been hacked—making no mention of the bovinolaw.net account—Baylor at UBS responded that because *Andrew's* email had been hacked, UBS would no longer be able to trust emails coming from *Bovino*. In addition, Baylor instructed Andrew that they would now "require a notarized letter from you containing your original signature detailing these same instructions."[129] Note that Baylor's response to the hacking issue was to assume immediately that Bovino's email had been compromised, as well as Andrew's—knowing full well UBS had received his and Andrew's stolen A/C emails from Christina and Patricia since at least the first of that year. Also note that Baylor conveniently made it *harder* for Andrew to seek help by making it more difficult for Andrew to receive the funds to go to Crossroads, adding the condition that his request be in a letter and notarized. Meanwhile Bovino, noting what he thought was confusion in Baylor's answer regarding his account being compromised versus Andrew's, answered, "My email has not been compromised, Seane. However, someone sent an email to [Andrew] representing that I changed my email address."[130]

59.    Later that day, Bovino sent a detailed email to Baylor with Andrew's requests

---

[127] Email from A. MacMillan to S. Baylor (Mar. 15, 2011), bearing Bates Nos. DBovino61, Ex. 75.

[128] *Id.*

[129] *Id.*

[130]  Email String (Mar. 15-16, 2011), bearing Bates Nos. DBovino399-DBovino401, Ex. 76.

regarding distributions to pay lawyers and for Andrew to be able to go to Crossroads.[131] In it, Bovino explicitly said that Andrew needed the funds to go to Crossroads on an emergency basis and wished to seek treatment.[132] That whole morning Kelly and Klein had been exchanging emails about ways to get Andrew's bail revoked and have him incarcerated.[133] Just after 1:00pm Klein wrote to Kelly informing him that *Patricia* did not want Andrew going to rehab out of the country.[134] In fact, according to the email traffic, Patricia had called Bogenschutz to try and convince him of that.[135] As noted, Bogenschutz refused to cooperate knowing that Defendants were getting the bond "pulled."[136]

60.    That evening, an email signed by Baylor at UBS was sent to Andrew and placed a number of additional conditions on UBS's distribution of funds to Andrew for treatment at Crossroads.[137] Among these restrictions was a demand for document from the court allowing Andrew to leave the country:

> Finally and equally important, because Andrew has posted bond for the misdemeanors he was charged with earlier this month, the [Trust] Committee requires a copy of the court order that allows Andrew to leave the country as part of the documentation needed to consider a distribution from the trust to cover the costs of treatment at a rehabilitation facility for Andrew.[138]

---

[131]   Email String (Mar. 15, 2011), bearing Bates No. CMacMillan326, at CMacMIllan326, Ex. 77.

[132]   *Id.*

[133]   Email String (Mar. 15, 2011), bearing Bates Nos. UBS687-690, Ex. 78.

[134]   *Id.*

[135]   *Id.*

[136]   *Id.*

[137]   Email String (Mar. 15, 2011), bearing Bates Nos. Bovino39878, Ex. 78.

[138]   *Id.*

All the while asking for proof of the court's approval for Andrew to leave the country, Defendants were working hard to make sure the court would revoke his bond and have him incarcerated, thereby making it impossible for him to go to Crossroads.

61.     By the morning of March 16, 2011, it was too late for Andrew: the wheels were already in motion to have him incarcerated. On March 16, Kelly emailed Klein advising her that he had spoken with Bogenschutz—*Andrew's lawyer*—who thought that if Andrew's motion to travel to Crossroads was not granted, the judge would likely allow Andrew to remain on his bond while they attempted to find a new treatment center.[139] In response, Kelly's advice to Klein was that "[i]f that happens . . . then someone needs to say that Andrew needs to be remanded to custody pending treatment, rather than released on bond."[140] Kelly then promised, "I can do that."[141]

62.     On March 16, 2011, Bovino forwarded to Klein and Vagedes the letter from Crossroads' Admissions office, confirming their acceptance of Andrew for treatment, which was one of the conditions imposed by Baylor in order for UBS to release the funds for Andrew to seek treatment.[142] Klein therefore knew that Andrew would be able to leave the country unless his bond was revoked. Later that same day, Klein emailed Kelly instructing him that after discussing the issue with Baylor and Vagedes, UBS wanted Kelly to send the letter to the judge that day via fax rather than the following day, as previously planned, because they (mistakenly)

---

[139] Email String, (Mar. 14-16, 2011), bearing Bates Nos. UBS707-711, at UBS707, Ex. 72; W. O'Neil Aff. (Jun. 22, 2011), bearing Bates Nos. DBovino1320-1326, Ex. 143.

[140] Ex. 72, at UBS707.

[141] *Id.*

[142] Email String (Mar. 16, 2011), bearing Bates No. UBS728-729, Ex. 80.

believed Bovino was going to submit documentation to the court regarding Andrew's acceptance into Crossroads that day.[143] Kelly replied that he would get the letter out that day to both the judge and the prosecutor.[144]

63. Kelly's March 16, 2011, letter to Circuit Judge Michael Usan of Broward County, Florida, copied to the prosecutor, purports to be on behalf of Christina and her son and requested that Andrew's bond be revoked based on Christina's domestic assault charge and that Andrew be taken into custody "to protect himself and others and so that he may be evaluated by proper medical health professionals and . . . to address serious mental health and drug addiction problems."[145] Notably missing from Kelly's letter is any reference to the fact that Andrew had voluntarily applied to Crossroads and had been accepted.[146]

64. Andrew attended the March 18, 2011 hearing, expecting to receive permission to attend drug rehabilitation at Crossroads, but the judge instead revoked his bond and remanded him to the custody of the North Broward County Jail.[147] For his work in March—the month he successfully conspired with UBS to put Andrew in jail instead of rehab—UBS paid Kelly $122,883 out of Andrew's trust funds.[148] From that point on there was no plausible way for Andrew to replace UBS with a different corporate trustee.

---

[143] Email String, bearing Bates Nos. DBovino6-7, at DBovino6, Ex. 81.

[144] Id.

[145] C. MacMillan Dep. Ex. 38 (Mar. 16, 2011), Ex. 82.

[146] Id.

[147] Hr'g Tr. Mar. 18, 2011, 5:4-10, U;15-19, *State v. MacMillan,* Cause No. 09-004808CF10-A (Fla. Cir. Ct. 2011), Ex. 51.

[148] *See* Email String (May 5, 2011), bearing Bates Nos. CMacMillan262-263, Ex. 83.

**G.      Defendants Interfere With Bovino's Attempts to Rescue Andrew from Detention.**

65.      On March 21 and 22, 2011, Bovino visited Andrew in North Broward County Jail.[149] Because Andrew's new criminal lawyer, Yale Galanter ("Galanter"), promised to file a motion to stay the criminal competency evaluations and reinstate ACM's bond pending Andrew's detox treatment at Crossroads, both men believed it was highly likely that Andrew would be allowed to travel to Crossroads. Such travel would require Andrew to be absent for six months, which made executing a Power of Attorney ("POA") allowing David to act in Andrew's stead on his business and personal matters a necessity. As a result, Andrew executed the POA on March 22.[150]

66.      In order to fully apprise Andrew of the significance of the power of attorney, Bovino had previously enlisted Susan Bullard, a probate specialist assisting him in Andrew's representation regarding the transfer of his trusts out of UBS, to draft a detailed document that he could present to Andrew, which was entitled "Summary of ACM Power of Attorney in Favor of David Bovino." Before Andrew signed the POA, Bovino went through Bullard's summary line by line. Regarding the powers that Andrew was delegating, Bovino advised Andrew (in the presence of a guard at the North Broward County Jail, and a jail employee, Denise Feeley), using Bullard's summary that under the POA, Bovino had the power to:

---

[149] *See* Email from S. Woodson to S. Baylor (Mar. 22, 2011), bearing Bates No. DBovino89, Ex. 87.

[150] A. MacMillan Power of Attorney (Mar. 22, 2011), Ex. 85. As stated above, Andrew had requested that David draft a POA as early as August 5, 2010, when Bovino's time records reflect that an associate drafted the POA, "for D. Bovino to act on Client's behalf for issues related to trusts." In the months that followed Andrew also informed UBS that he wanted Bovino to act as his attorney-in-fact. August 2010 Invoice from Bovino to A. MacMillan (Sep. 1, 2010), Ex. 73.

(1)     take any affirmative action that Andrew can take relating to any of his trusts and any other transaction, business, or property;

(2)     make demand for or claim, in any fashion, any property in which Andrew has an interest in any regard;

(3)     acquire, in whatever fashion, any property which he deems proper;

(4)     deal with, in whatever fashion, any property Andrew owns or may own at any time, as he deems proper;

(5)     transact business in Andrew's name and borrow any monies that he deems proper;

(6)     made distribution requests from, maintain all communications with Andrew's trustees, and take all actions necessary to make a change in trustees;

(7)     handle all financial documents and instruments as he deems proper in the furtherance of the power of attorney;

(8)     make all gifts and pay all necessary accompanying taxes, except that Bovino could not make gifts benefitting himself in excess of the federal annual gift tax exemption amounts;

(9)     sign all tax returns and related documentation;

(10)    make any withdrawals from Andrew's trusts as he chooses, subject to the limitations of the trusts; and

(11)    do anything that Andrew can do.

And, regarding the practical impact of the POA, Bovino further advised Andrew, using Bullard's summary, that Bovino had the power to:

(1)     sign Andrew into treatment;

(2)     direct that UBS pay for treatment, all attorneys' fees and expenses, and all court costs;

(3)     hire and fire all of Andrew's assistants, accountants, attorneys, staff, assistants, etc.;

(4)     commence, manage, and settle any and all litigation;

35

    (5)      pay any of Andrew's debts, including court fines, bonds, and other obligations;

    (6)      manage all of Andrew's financial assets, including all real and personal property; and

    (7)      do anything regarding Andrew's assets that Andrew can do.

In addition, Bovino further advised Andrew, using Bullard's summary, that the POA was durable in nature and that it would remain in effect in the event of incapacity, either temporary or permanent. Regarding Andrew's mental state when he signed the POA on March 22, 2011, Bovino executed an affidavit the same day, notarized, stating that during his visit Andrew had been in jail for a period of five days and had not ingested any drugs or alcohol and that Andrew was coherent, rational, and actively engaged in the conversation regarding the power of attorney.[151]

    67.     On March 22, 2011, Bovino, through an associate, submitted the distribution request and POA to Baylor at UBS.[152] After Baylor forwarded the email to Klein, Klein forwarded the email to Kelly and Morris Sherman, again, a partner at the law firm whose consent was required to replace UBS as trustee and the man who arranged Kelly's hiring.[153] In her email, Klein wrote, "For your opinion," seeking legal advice on behalf of UBS.[154] Kelly replied with a discussion of the POA and the psychological examination, reflecting that the results of the examination—yet unknown—would dictate whether Defendants would be able to attack the

---

[151] Aff. D. Bovino (Mar. 22, 2011), bearing Bates Nos. CMacMillan336-337, Ex. 86.

[152] *See* Email from S. Woodson to S. Baylor (Mar. 22, 2011), bearing Bates No. DBovino89, Ex. 87.

[153] Email String (Mar. 22, 2011), bearing Bates Nos. UBS770-771, Ex. 88.

[154] *Id.*

POA.[155] Kelly then suggested he, Klein, and Sherman have a conference call the following

morning.[156]

68.     On March 23, 2011, Kelly emailed Klein indicating Bogenschutz, who previously

had refused to ally himself with Defendants, had changed his mind, stating, "Just talked to

Bogenschutz. He is loaded to bear to go after Bovino. I told him you would help."[157] Shortly

thereafter, on March 31, 2011, Kelly emailed Klein and Vagedes that he thought they "were

winning the battle of Bovino."[158] Not surprisingly, UBS exercised its discretion regarding legal

fees in favor of paying Bogenschutz's to date—and as will be seen, apparently much more.

69.     On March 30, 2011, the court—Judge William W. Haury—determined that

Andrew was incompetent to stand trial on the criminal charges.[159] The finding was based on

reports by the two mental health professionals, including Dr. Brannon, the psychologist hired by

Bogenschutz, whom the judge had assigned to determine Andrew's competency. Dr. Brannon

subsequently resigned without explanation.[160] As Bogenschutz explained to Klein, he had no

idea why.[161] From March 2011 to July 15, 2011, Andrew was either in jail or institutionalized,

being transferred from Fort Lauderdale Hospital, a run-down facility ill-equipped to help cure

him of his drug addiction or his mental health issues, to Challenges Addiction Treatment Center

---

[155] *Id.*

[156] *Id.*

[157] Email String (Mar. 22, 2011), bearing Bates No. UBS785-787, at UBS787, Ex. 84.

[158] Email from Kelly to Klein, Vagedes (Mar. 31, 2011), bearing Bates Nos. UBS890-891, Ex. 89.

[159] Corrected Order (Mar. 30, 2011), Ex. 90.

[160] Email String (Jul. 6-11, 2011), bearing Bates Nos. UBS1471-1474, at UBS1472, Ex. 114.

[161] *Id.*

("Challenges"), all the while entailing confinement under difficult conditions.

70. On April 25, 2011, Bovino wrote to Weinstock, UBS Trust's general counsel to "inform" him of the ".net" account. This was a month after Bovino had already notified Baylor at UBS.[162] Weinstock answered that UBS had nothing to do with this issue and that, at best, it would afford UBS some "insight into [Christina's] credibility, integrity, etc."[163] That same day, Kelly emailed Klein that he was planning on proceeding with an ethics complaint against Bovino and that he wanted "to be sure that you and [Baylor] are behind [Christina] in taking this step. I will send the claim to you before it is lodged with the Colorado authorities."[164] On April 28, 2011, Kelly emailed Klein the draft of his ethics complaint against Bovino.[165] The next day, Klein emailed Kelly advising him that she had obtained UBS approval to file the complaint against Bovino.[166] It is telling that Kelly's firm, Kelly and Hannah, P.A., not only had to seek UBS'*s approval* to file the complaint, but it did not even have Christina's contact information and communicated with Christina *through* Klein of UBS. In fact, this was the time, noted above, that Kelly's administrative assistant emailed Klein asking her to forward *Christina's* grievance against Bovino *to* Christina because Kelly's firm didn't "have any contact information for

---

[162] Email from D. Bovino to I. Weinstock (Apr. 26, 2011), bearing Bates No. PMacMillan260-261, Ex. 91.

[163] *Id.*

[164] Email String (Apr. 25, 2011), bearing Bates Nos. UBS1045, Ex. 92.

[165] *See* Email from T. Kelly to J. Klein (Apr. 28, 2011), bearing Bates Nos. UBS1072-1076, Ex. 93.

[166] *See* Email from J. Klein to T. Kelly (Apr. 29, 2011), bearing Bates No. 1092, Ex. 94.

her."[167]

71.    On May 4, 2011, Kelly, with UBS's blessing, filed the grievance alleging that Bovino exerted undue influence over Andrew in obtaining the POA and had made false statements during Andrew's criminal competency hearing. Bovino was never disciplined by the Colorado Office of Attorney Regulation.[168]

72.    In May 2011, Andrew was transferred to a facility called Challenges, a privately owned center in Florida. Andrew was kept at Challenges until July 2011. During that time, Andrew frequently called Bovino seeking help, including requesting Bovino to file a lawsuit against Patricia regarding her role in stealing the privileged communications between Andrew and Bovino.

73.    On May 10, 2011, Bovino, on behalf of himself, his law firm, and pursuant to Andrew's specific instruction, filed suit against Patricia in the district court in Pitkin County— the predecessor to this lawsuit before it was removed to federal court. The suit sought to recover damages based on the cybercrimes committed against Bovino and Andrew.[169]

**H.    Caged and Isolated, Andrew Surrenders to Patricia's and Christina's Control.**

74.    During April and May, Patricia and Christina visited Andrew frequently, in jail or

---

[167] Email from J. Zimmerman at Kelly and Hannah, P.A. to T. Kelly (Mar. 16, 2011), bearing Ref. No. UBS 049-5785, Ex. 95.

[168] *See* Ltr. from T. Kelly to Office of Attorney Regulation, Colorado, Re: Christina MacMillan (May 4, 2011), bearing Bates Nos. Bovino36892-36898, Ex. 96.

[169]  Following a story in the Aspen Times about the lawsuit the following day, a person named "Margaret" with the email mameldeau@aol.com wrote to Patricia, expressing sympathy about the lawsuit, Email String between P. MacMillan and "Margaret" (May 12, 2011), bearing Bates No. PMacMillan204, Ex. 97. Patricia responded that Andrew wasn't the one suing her, but that Bovino—"a drug user"—was only using him, "Andrew not suing me drugie using him[sic]?" *Id.*

while confined to a county or private hospital, from which he could not leave, where Patricia promised him that if he voluntarily agreed to her becoming his guardian he would receive money, a new home, and his freedom.  At first, Andrew would not agree.

75.     On May 2, 2011, Klein emailed Kelly and Bogenschutz telling them she had spoken with Patricia that morning and that she wanted to "move along towards guardianship proceedings."[170] During this period, email after email among the Defendants discussed the likelihood of success in obtaining guardianship over Andrew, strategy, and funding for lawyers assisting them.[171]

76.     In a May 5, 2011, email from Sherman to Klein and Baylor, Sherman forwarded a retainer agreement between Patricia and Adrian Thomas, a Florida probate attorney, ("Thomas") and wrote that "I don't know if Patricia [who is not a beneficiary of Andrew's, or any, trust] can promise payment within 30 days of your invoice since we hope the fees will be paid by UBS and their processing time may require more than 30 days."[172]

77.     On May 12, Thomas filed Patricia's Petition for Appointment of Emergency Temporary Guardian and a Petition to Determine Incapacity in the court of General Magistrate

---

[170] Email String (May 2-3, 2011), bearing Bates Nos. UBS 1102, Ex. 101.

[171] *See, e.g.,* Email String (Jul. 13, 2011), bearing Bates No. UBS1487, Ex. 102 ("JDB" (likely Bogenschutz) updating Klein regarding Bovino's attempts to intervene in the guardianship and asking to be paid), Email from T. Kelly to J. Klein and L. Vagedes (May 14, 2011), bearing Bates No. UBS1350, Ex. 103, Email String (May 11, 2011), bearing Bates Nos. UBS1332-1333, Ex. 104

[172] Email String (May 11, 2011), bearing Bates Nos. UBS1332-1333, Ex. 104.

Rita Berry, citing the criminal court finding of incompetence to stand trial on March 30.[173] On

May 14, Kelly emailed Klein, stating that Christina was afraid she had jeopardized Patricia's

potential guardianship by creating the www.bovinolaw.net account.[174] Kelly discussed her

concern with two other lawyers, "Mo" [Sherman] and David Lenyo, Patricia's Aspen lawyer and

together they determined that "the Bovino lawsuit [would] not impact Patricia's efforts."[175]

Ironically, and accurately, Kelly goes on to say, "I am still troubled that Patricia has a conflict of

interest in regard to serving as guardian of the property of Andrew but I think that will manifest

itself in regard to distribution requests and reasons therefore. . . . [I]t will call for some tough

calls by Seane [Baylor of UBS]."[176]

78.     On May 17 General Magistrate Berry conducted a hearing on Patricia's Petition

for Appointment of Emergency Temporary Guardian, and two days later, on May 19, appointed

an attorney to represent the "alleged incapacitated person" and three mental health professionals

to determine Andrew's competency to exercise certain rights under Florida law, including the

right to conduct his own business affairs and medical treatment.[177] This is also the day Bovino

---

[173] Pet. to Determine Incapacity (May 12, 2011), bearing Bates Nos. DBovino_1189-DBovino_1193, Ex. 129; Pet. for Appointment of Emergency Temporary Guardian (May 12, 2011), Ex. 134.

[174] Email from T. Kelly to J. Klein and L. Vagedes (May 14, 2011), bearing Bates No. UBS1350, Ex. 103 ("Christina called last week very concerned that she had put Patricia's effort to obtain guardianship over Andrew at risk through the creation of a website with a name close to that of Bovino's law firm. I talked with Mo and with David Lenyo, Patricia's Aspen lawyer. Their view is that the Bovino lawsuit will not impact Patricia's efforts, which I reported to Christina today.")

[175] Id.

[176] Id.

[177] Notice and Order Re: Pet. To Determine Incapacity (May 19, 2011), bearing Bates Nos. DBovino1194-DBovino1195, Ex. 130.

introduced Andrew to David Garten ("Garten") a Florida probate lawyer retained by Bovino to represent Andrew. Garten attended the May 17 hearing.

79.     Following the hearing on May 17, believing that Garten was working for Andrew's benefit, Bovino emailed Andrew's litigation team and noted that Garten had made an appearance at the temporary guardianship hearing.[178] According to Bovino, Garten was supposed to remain in the case pursuant to Andrew's request, obtain the requisite doctors to treat Andrew, and hopefully, ensure the guardianship petition got denied.[179] On May 18, General Magistrate Berry denied Patricia's Petition for Appointment of Emergency Temporary Guardian, which only left Patricia's Petition to Determine Incapacity up for decision.[180]

80.     On May 24, 2011, following Magistrate Judge Berry's order, Bovino wrote another email noting that Andrew was "anxious" to meet with Garten, who both Bovino and Andrew believed was representing Andrew properly.[181] It would be some time before they understood the treachery at play.

81.     That same day, May 24, Joyce A. Leons, LCSW ("Leons") examined Andrew and found him to be incapable of exercising his rights to contract, as well as sue and defend from lawsuits.[182] Leons reached her conclusion regarding those topics based on her findings that, at

---

[178] *See* Email from D. Bovino to S. Bullard, M. Railsback, S. Woodson, L. Lyon, and D. Garten (May 17, 2011), bearing Bates No. DBovino127, Ex. 105.

[179] *Id.*

[180] Report and Recomms. Of Gen. Magistrate on Pet. for Appointment of Emergency Temporary Guardian (May 18, 2011), Ex. 135.

[181] *See* Email String (May 24, 2011), bearing Bates Nos. DBovino129, Ex. 106.

[182] Report of the Examining Committee Member Joyce A. Leons, LCSW (May 24, 2011), bearing Bates Nos. DBovino1143-1147, Ex. 125.

that time, Andrew was vulnerable to exploitation.[183] Undeterred, Bogenschutz obtained an affidavit from Andrew the very next day to secure Andrew's dismissal of a bar complaint filed by Bovino, *against Bogenschutz*, on Andrew's behalf.[184] Bogenschutz notarized the affidavit himself.[185]

82.     After a hearing the court denied the emergency motion, but the case remained pending until the three court-appointed mental health professionals had the opportunity to evaluate Andrew.[186] In May, the Florida Criminal Court—at Bogenschutz's specific request—transferred Andrew to Challenges. On May 26, 2011, George Brockway ("Brockway"), Director of Case Management at Challenges, sent an unsolicited fax to Bovino containing a status update regarding Andrew.[187] In that fax, Brockway promised to contact Bovino "routinely to report presence in treatment and anticipated date of discharge."[188] In response, Bovino called Brockway, who informed Bovino that Andrew had designated Bovino as his outside point of contact while Andrew was at Challenges. On June 2—one week after receiving the fax—Bovino sent Andrew a Fed Ex envelope with the subject, "Attorney-Client Privileged Package for Andrew MacMillan" containing a status update.[189] Inexplicably, Challenges refused to abide by

---

[183] *Id.*

[184] A. MacMillan Affidavit (May 25, 2011), bearing Bates Nos. DBovino1141-1142, Ex. 124.

[185] *Id.*

[186] *Guardianship of Andrew MacMillan,* File No.: PR-C-11-0002246-60, Jul. 14, 2011, Hr'g Tr. 8:18-23, Ex. 99.

[187] Fax from Challenges to Bovino regarding Andrew's status, bearing Bates Nos. DBovino1274-1275, Ex. 137.

[188] *Id.*

[189] Ltr. from Bovino to A. MacMillan, c/o G. Brockway, Challenges (Jun. 2, 2011), bearing Bates Nos. DBovino1276, at 1276, Ex. 138.

Andrew's wishes and refused to deliver the FedEx envelope. Instead, Challenges filed a Motion for Clarification regarding the people authorized to communicate with Andrew.[190] Pursuant to previous orders regarding Andrew's communications, Andrew was authorized to communicate with his "mother, wife, Dr.'s Brannon and Butts [sic], [Fort Lauderdale Hospital] staff and attorneys, David Bogenschutz and Yale Galanter" and "any attorney of record."[191] At that time, Bovino was attorney of record for Andrew in the above-styled litigation. At the hearing on the Motion for Clarification, Bogenschutz argued that "attorney of record" was limited to "attorney of record" in Florida, not in Colorado. The court, unfortunately, agreed. As a result, Andrew was never permitted to review the Attorney-Client communications in the FedEx and the envelope was sent back to Bovino's office. Also, Bovino was cut off from communicating with Andrew. The reasons for interrupting all communication between Bovino and Andrew during the month of June became clear when Andrew was first allowed to talk to Bovino on July 12.

83.   Defendants, along with Christina and Patricia, used the communication blackout to extract Andrew's agreement to a voluntary guardianship for one year, with Patricia as guardian.[192] On July 10, 2011, Bogenschutz, who successfully cut off Bovino from communicating with Andrew, himself visited Andrew,[193] who was confined at Challenges. Bogenschutz relayed the substance of his meeting with his client to Klein the next day, via

---

[190] Mot. for Clarification, *Florida v. MacMillan*, Cause No. 09-004808 CF 10A, 09-007670 CF 10A (Jun. 13, 2011), bearing Bates Nos. Ex. 139.

[191] *Id.*

[192] Pet. For Voluntary Guardianship (Jul. 12, 2011), bearing Bates Nos. DBovino1196-DBovino1199, Ex. 98.

[193] Email String (Jul. 6-11, 2011), bearing Bates Nos. UBS1471-1474, Ex. 114.

email.[194] According to Bogenschutz,[195] Andrew refused to sign the documents that Bogenschutz

presented him, based on Andrew's belief that he was probably going to be released that week

because he expected the court-appointed mental health experts would declare him competent.[196]

Indeed, during that exchange between Bogenschutz and Klein, Bogenshutz wrote, "Apparently,

'they' expect to have doctors who will say that he is competent and should be released . . . ."[197]

Bogenschutz was no longer aligned with Andrew's defense team but, rather, coordinating

strategy with instead. In fact, "they"—Andrew and Bovino—would turn out to be correct but by

then, it didn't matter. The next day Bogenschutz was successful: On July 11, 2011—confined

since March 18—Andrew signed a Petition for Voluntary Guardianship for one year and

agreeing to his mother's appointment as guardian.[198]

   84. On July 12, Andrew—who was finally allowed to communicate with Bovino—

informed him that he had agreed to the one-year voluntary guardianship. Bovino had always

known this was not in Andrew's best interest and warned him—not for the first time—that once

he signed away the powers he had over his property, even for a year, he'd have great difficulty

---

[194] *Id.*

[195] *Id.* Not surprisingly, UBS paid Bogenschutz's fees without cavil. Indeed, on June 24, 2011, Bogenschutz had emailed Klein to request significantly more fees in addition to what UBS had already paid him, advising that he and his partners "have been discussing the continued aggravation" of Andrew's representation and that the "proverbial 'bottom line' is that, after review, we believe that *additional* fees in the amount of $150,000 are appropriate at this time for matters of representation and work completed, above and beyond the initial fee quoted, and which we have received. . . . Please advise as to the bank's position on the above matter." Email String (Jun. 24, 2011), bearing Bates No. UBS 1434, Ex. 115 (emphasis added).

[196] *Id.*

[197] Email String (Jul. 6-11, 2011), bearing Bates Nos. UBS1471-1474, Ex. 114.

[198]  Pet. for Vol. Guardianship (Jul. 12, 2011), bearing Bates Nos. DBovino1196-DBovino1199, Ex. 98.

getting them back.  Bovino, again, would be proven right.

85.     On July 12, Andrew filed the petition for voluntary guardianship, against Bovino's advice, handing over guardianship to Patricia.[199] Bovino, pursuant to the POA, immediately filed a pleading in the probate court, objecting to the guardianship, and asking the court to hold a hearing on whether there was a less restrictive alternative to a guardianship and whether Patricia was an appropriate guardian.[200]

86.     A hearing was held before Judge Charles Greene (who was sitting in for Judge Grossman) the next day, July 14, 2011, on Andrew's guardianship petition.[201] Bovino was allowed to attend the hearing from Colorado by phone to argue his (Bovino's) motion objecting to the guardianship. However, as soon as Bovino was placed into the courtroom by speakerphone, the court struck his pleading, finding that Bovino had engaged in the unauthorized practice of law [a crime in Florida]—and hung up on him.[202] Kelly immediately submitted the court's finding to the Office of Colorado Attorney Regulation in further support of the grievance he had filed on behalf of Cristina against Bovino two months earlier.[203] (Eighteen months later, on December 5, 2012, the court's finding of unauthorized practice of law was summarily

---

[199]     *Id.*

[200]     Obj. to Pet. For Voluntary Guardianship, *State v. MacMillan*, Cause No. PR-C-11-0002246-60J (Jul. 13, 2011), Ex. 100.

[201]     *Guardianship of Andrew MacMillan,* Hr'g Tr. File No.: PR-C-11-0002246-60, Jul. 14, 2011, Ex. 99.

[202]     *Id.* at 3:22-5:20.

[203]     Ltr. Remitting Kelly Invoice to Christina c/o UBS Financial Services, bearing Bates Nos. UBS1715-1718, Ex. 109 (containing entry on 7/19/2011 of drafting a letter to the Colorado Attorney Regulation—the day after the Court docketed the order striking Bovino's objection to the petition).

reversed on appeal.)[204]

87.     During the July 14, 2011, hearing, the court announced that the three mental health professionals it had appointed examined Andrew[205] and had concluded that, while Andrew had a drug problem, an involuntary guardianship was not warranted over any non-medical aspect of his life, including, among other things, his ability to contract, sue and defend lawsuits, or manage his property.[206] The only aspect over which Andrew would require a guardian would be medical decisions.[207] Nothing else.

88.     Judge Greene made it clear during the hearing that Andrew was under no obligation to give Patricia guardianship over his property or assets. As the judge stated, "Clearly, Mr. MacMillan, from the reports that the Court has received, is competent to contract as he chooses."[208] The court noted that under these circumstances, it would normally "enter into a limited guardianship."[209] The court repeatedly explained that Andrew could, if he desired, retain all his other rights except the right to make medical and healthcare decisions,

> The Court would be willing pursuant to the petition, to appoint your mother for that purpose. At that point, you have all your other rights restored that are not in question. You have the ability to contractually enter into whatever agreement, with the assistance of your attorneys, or anyone else, that gives whatever rights you want to your mother or to anyone else.[210]

---

[204]     *Bovino v. MacMillan et al.*, 101 So.3d 937, 939 (Fl. Dist. Ct. App. 2012).

[205]     Hr'g Tr. Jul. 14, 2011, at 8:18-9:2, Ex. 99.

[206]     *Id.* at 9:4-10:4.

[207]     *Id.*

[208]     *Id*. at 9:18-20.

[209]     *Id*. at 9:15-17.

[210]     *Id.* at 12:23-13:6

The court then adopted the three examiners' reports.[211] At that point, there was a very brief recess in the proceedings.[212] When the parties went back on the record, Andrew was sworn in to confirm he had filed a Petition for Voluntary Guardianship to have Patricia appointed as his guardian.[213] The court then went through the scope of Andrew's guardianship.

89.     The court recounted the fact that on July 11, 2011, Andrew signed an agreement making his mother his voluntary guardian as to property, which included the right to pursue and defend lawsuits on his behalf, apply for government benefits, and manage his property, make gifts, and dispose of Andrew's property.[214] After going through the scope of the guardianship agreement, the judge, despite his obvious reluctance, appointed Patricia as Andrew's guardian over all of Andrew's property, as well as over his medical and healthcare decisions. Note that although Andrew only needed a guardian over his medical and healthcare decisions, based on his history of substance abuse and diagnosed mental disorders, Patricia *did not* seek to be appointed guardian as to those issues, which makes her (and the Defendants') frequent protestations of concern for Andrew's health ring hollow. The next day Andrew participated in a competency hearing as a result of which he was voluntarily transferred to SeaSide Palm Beach Luxury Alcohol and Drug Rehab.

90.     On July 28, 2011, the Florida courts held a hearing to re-assess Andrew's criminal competency during which the judge found Andrew competent to stand trial on the criminal

---

[211]     *Id.* at 14:23-16:11.

[212]     *Id.* at 16:12-16.

[213]     *Id.* at 17:10-23.

[214]     *Guardianship of Andrew MacMillan,* Jul. 14, 2011 17:17-18:13, File No.: PR-C-11-0002246-60.

charges pending against him and, according to email exchanged between Patricia and Klein during the hearing, was going to release him two weeks from the date of the hearing.[215] Upon hearing the news, Patricia emailed Klein from the courtroom on her iPhone, informing Klein of that fact.[216] Incredibly, Klein, responded "OMGoodness! Do we have a problem?"[217] After Patricia replied that the court was "talking what to do next [sic]," Klein's response was "OMG."[218] It is unclear why Klein and Patricia were alarmed given that Andrew had submitted to voluntary guardianship, but they were, making clear where there interests lay and it wasn't with Andrew's wellbeing. Andrew remained at SeaSide until his release in August, 2011, and returned to his mother's home in Hillsboro, where he stayed until on or about September 15, 2012.

91.     Throughout this period, Bovino assumed that Garten was representing Andrew and Andrew's interests—and according to what Garten told Bovino, was aligned with Bovino. What Bovino did not know was that Garten was, in fact, assisting Defendants instead—and was being paid handsomely to do so. Or that one of his specific tasks was to "keep Bovino out of Florida."[219] In late July 2011, Garten complained to Christina that her attorneys had asked him to reduce his invoice for the time he spent talking to Bovino. But, Garten noted, those were not "just" conversations. They were "in furtherance of [his] representation of Andrew and vital in

---

[215]    Emails between J. Klein and P. MacMillan (Jul. 28, 2011), bearing Bates Nos. UBS1533-1534, at UBS1533 (labeled J. Klein Dep. Ex. 115), Ex. 108.

[216]    *Id.*

[217]    *Id.*

[218]    *Id.*

[219]    Email from D. Garten to C. MacMillan, Fwd: P. MacMillan (Jul. 25, 2011), bearing Bates Nos. PMacMillan214 (Jul. 25, 2011), Ex. 113.

making sure *Bovino stayed away from Florida*."[220] Christina immediately forwarded the email to Patricia.

92.     Shortly thereafter, on August 4, 2011, while still under his mother's guardianship and living with her, Andrew executed an affidavit purporting to dismiss his lawsuit alleging the cyber-attacks against Patricia.[221] Patricia then filed a Motion to Dismiss this suit, as Andrew's guardian, which was granted without prejudice to refilling.[222] The conflict was so apparent that even Baylor, at UBS, wrote to Kelly on August 31, 2011, confirming that Patricia was actually using her position as guardian to dismiss a lawsuit against herself and asking, "Isn't that a conflict of interest?" Klein answered, "Yes and Yes!" but added that UBS was "not involved" and this conflicted situation was Thomas's "problem." [223]

I.     **Defendants, along with Christina's and Patricia's Desperate and Continued Attempts to Maintain Control over Andrew's Assets.**

93.     For the following year, Andrew rarely communicated with Bovino, at least not until events proved Bovino's warning to Andrew correct: that his family was not going to terminate the guardianship or their control over him. On June 22, 2012, Garten wrote Andrew telling him he had received a copy of Andrew's "consent" to extend Patricia's voluntary

---

[220]     *Id.* (emphasis added).

[221]     A. MacMillan Aff. (Aug. 4, 2011), bearing Bates Nos. DBovino2302-2304, Ex. 122.

[222]     By then, Patricia had complete control of Andrew's affairs. In order to secure dismissal, Bogenschutz had obtained an affidavit from Andrew, who was then under Patricia's guardianship, in order to have Andrew dismiss the suit against Patricia. There could be no more conflicted situation. *See* Aff. A. MacMillan (Aug. 4, 2011), bearing Bates Nos. DBovino1138-1140, Ex. 122.

[223]     Email String (Aug. 30-1, 2011), bearing Bates Nos. UBS1695, Ex. 133.

guardianship over Andrew by two years.[224] The same day, Andrew responded "I have no

intention of extending the guardianship and did not sign."[225] Christina forwarded a copy of this

email to Klein and Vagedes.)[226] This time, however, Christina accused Patricia of falsifying

Andrew's signature on the guardianship extension to UBS.[227]  She also accused Patricia of

getting her son drunk so that he would leave with her and not stay with his wife so they could

attend an ultrasound appointment together.[228] On June 25, 2012, Christina emailed Andrew

asking him about another document purportedly signed by him and circulated by Garten in which

Andrew gave his mother permission to not provide an accounting. Christina noted, "Thats [sic]

very fishy!"[229]

94.     Two days later, Christina again emailed Andrew and begged him to stop his

mother, exhorting him, "For gods sake do something!" and added that Patricia's reason for

seeking guardianship was to "get guardianship for 2 more years, and not have to provide you or

the courts with any accounting."[230] But Andrew, with no access to his funds and her very

credible threat of an incompetency determination if he refused to do Defendants, along with

Christina and Patricia's bidding, was vulnerable.  Patricia promised Andrew $250,000 and in

---

[224]     *See* Email String (Jun. 22, 2012), document bearing Bates Nos. UBS2255-2257, <u>Ex. 110</u>.

[225]     *Id*. at UBS2255.

[226]     *Id*.

[227]     *Id*.

[228]     *Id*.

[229]     Email String (Jun. 25, 2012), bearing Bates Nos. CMacMillan615R-CMacMillan616R, <u>Ex. 112</u>.

[230]     Email String (Jun. 27, 2012), bearing Bates Nos. UBS2264-2265, <u>Ex. 117</u>.

July 2012, he agreed to extend his mother's guardianship over him for another six months.[231]

95.     As noted, Andrew did not communicate a great deal with Bovino during the year he was under his mother's care, but when he did call, from his mother's home in Moab, Utah, on or about September 15, 2012, Andrew was terrified: his mother's boyfriend, Cyprian Emerson, had held a gun to his head and threatened to kill him.  (He also reported that during that year, he had made a dozen 911 calls to the Hillsboro Police Department.) Bovino arranged for a cab to drive Andrew and two employees to Aspen, where, at Bovino's request, family friends of Bovino's took Andrew in. Andrew lived with the Stearns until mid-January, 2013, with one failed trip home at Thanksgiving to try to reconcile with his family, ending when Andrew scraped together enough money for a flight back to Aspen and Stearn's home.

96.     Around November 2012, Robin Bresky, an attorney, filed a petition to terminate the guardianship on Andrew's behalf.[232] In response, and as part of their continuing efforts to stop Bovino's representation of Andrew, Patricia and Christina—despite the friction between them—filed to place him in an involuntary guardianship.[233] Instead, Andrew waited them out and as soon as the six-month extension expired, he obtained a court order, on January 15, 2013, terminating the voluntary guardianship.[234] Ironically it would be his decision one month later to pay Bovino $500,000 in legal fees that had been outstanding for almost two years that triggered

---

[231]    Am. Ltrs. of Voluntary Guardianship Extending P. MacMillan Guardianship (Jul. 12, 2012), bearing Bates Nos. DBovino1148, Ex. 126.

[232]    Pet. to Terminate Gurdianship, *In re Guardianship of Andrew Cargill MacMillan*, Cause No. PRC110002246 (Fla. Cir. Ct. November 30, 2012) (Broward County 17th Judicial Circuit, Probate Division), bearing Bates Nos. DBovino1205-1273, Ex. 136.

[233]    Kelly represented Christina in these proceedings.

[234]    A. MacMillan Voluntary Guardianship Termination, *In re Guardianship of Andrew Cargill MacMillan*, Cause No. PRC110002246 60J (Jan. 15, 2013), Ex. 118.

his institutionalization from virtually that day to this.

97.    In January 2013 Andrew, finally free from the guardianship, filed for a restraining order, and obtained a temporary restraining order against Patricia and Emerson.[235] In his application, Andrew alleged that Patricia forced him to hire Emerson as his body guard and sobriety coach even though Emerson was never around, drank with Andrew, physically threatened him, and pulled his firearm on him.[236] Andrew also attached text messages from Patricia that said, "Sign paper work voultary [sic] If u don't sign I not be able to help u any more."[237] Andrew also attached a text message from Andrew to Bovino explaining, "My mom is forcing me to do stuff by controlling my medications. I.e. had to go to moab [Utah] cause she wouldn't give me Meds in aspen. [sic]."[238] The application for restraining order against Emerson included Andrew's allegations that in the Bahamas Emerson "pointed a gun" at him and presented him with "forged legal document[s]" to extend the guardianship by two years.[239] Unfortunately for Andrew, trial on Andrew's request for a permanent restraining order was scheduled in February, when—as discussed below—Andrew was once again in a facility. Nobody appeared on Andrew's behalf. No permanent restraining order was issued.

---

[235]    Citation and Temporary Civil Protection Order Issued, *MacMillan v. MacMillan,* Cause No. CD492013C 000503 (Col. Cty. Ct. Jan. 16, 2013), bearing Bates Nos. DBovino1283-1299, Ex. 141; Return of Service for Citation and Temporary Civil Protection Order Issued Pursuant, *MacMillan v. MacMillan,* and *MacMillan v. Emerson*, bearing Bates Nos. DBovino1281-1282, Ex. 140.

[236]    *Id*.

[237]    Ex. 141, at 10.

[238]    *Id*. at 11.

[239]    Citation and Temporary Civil Protection Order Issued, *MacMillan v. MacMillan,* Cause No. CD492012C 000562 (Col. Cty. Ct. Jan. 9, 2013), bearing Bates Nos. DBovino1300-1219, Ex. 142.

98.     Prior to March 18, 2011, the date Andrew was incarcerated, Bovino had done a great deal of legal work for Andrew that UBS refused to pay.[240] Pursuant to the terms of his Engagement Agreement with Andrew, Bovino filed a request for arbitration to August 13, 2012.[241] However, Bovino did not pursue this matter until 2013, when Andrew was freed of guardianship and had been declared legally competent to stand trial—although Andrew was never found incompetent to contract. On February 14, 2013, after reviewing the settlement in Florida with two attorneys[242] (Bovino was in Aspen), Andrew executed the settlement agreement.

99.     When Andrew returned home and informed Emerson and Patricia of the agreement; they were enraged and accused him of betraying them. After being yelled and screamed at by them, on February 15, 2013—the day after executing the settlement with Bovino–Andrew apparently attempted suicide and was hospitalized. While Andrew was hospitalized, Andrew was found criminally incompetent. As a result of this finding, on March 28, 2013, the Judge Grossman of the Broward County Court, Probate Division as a result of an *ex parte* proceeding during which Andrew was not present and of which Bovino was not notified, found Andrew incompetent and appointed Christina and Patricia as Andrew's co-

---

[240]     The settlement agreement between Bovino and Andrew covered fees up to December 2011.

[241]     Ltr. from Bovino, represented by Dorsey, to E. Mauro, Judicial Arbiter Group, Inc. Re: Arbitration Request (Aug. 13, 2012), Ex. 116.

[242]     One of the lawyers, Robin Bresky, had represented David on appeal of the finding of unauthorized practice of law and had accepted Andrew's representation on the settlement matter only after obtaining a waiver of conflict from David and Andrew. Robin Bresky brought in Probate attorney Ellen Morris to assist with her representation of Andrew in the guardianship proceedings. Andrew reviewed the fee arbitration settlement agreement with both Bresky and Morris at Ellen Morris' office on February 14 before executing the agreement. Bovino did not pay or offer to pay either lawyers's fees.

guardians.[243] Andrew was institutionalized, first at the Fort Lauderdale Hospital (again) and eventually transferred to the Treasure Cove Treatment Center. Treasure Cove Treatment Center is where Florida warehouses convicted felons and those, such as Andrew, who will be there indefinitely, until he is adjudged neither a threat to others nor himself and is competent to stand trial on drug-related charges. On the same day, the court appointed Christina and Patricia as Andrew's co-guardians.[244] Once again, Patricia and UBS, and now Christina, were in charge of Andrew's personal and business affairs.[245]

100.    Also on that same day, March 28, Klein was deposed in this case. Shortly thereafter UBS signified its intention to resign as trustee of Andrew's trusts, allegedly because of a threat Andrew made against Klein two months before. However, given Klein's admissions in the deposition regarding her role—especially regarding the emails—UBS's reason for resigning is not entirely convincing. In fact, to date UBS has not resigned and instead, has demanded that Patricia and Christina execute a release of all liability, including one on Andrew's behalf—and to make certain that happens, as of March 2013, cut off all distributions, including for the care of Christina's now, two, children six months ago. As bait, UBS has also agreed, prior to resigning, to distribute several million dollars to Patricia, Christina, and their lawyers—once the release is signed and approved by the court.

---

[243]    Order Appointing C. MacMillan and A. MacMillan as Andrew's Co-Guardians (Mar. 28, 2013), Ex. 119.

[244]    *Id.*

[245]    Andrew called Bovino almost every day from Fort Lauderdale Hospital and then from Treasure Cove. The calls stopped on August 10, 2013. During those calls, Andrew reported to Bovino that he had received an accounting and that his mother, while guardian, with the power of gifting has created phony charitable trusts and has transferred millions of dollars to her boyfriend.  Patricia failed to produce that accounting, although required to do so, on Friday, October 11, 2013.

**J.      Defendants, along with Christina and Patricia's Character Assassination of Bovino: "The Battle of Bovino."**

101.    In the words of Christina, the only thing that concerned her was Bovino:

> Q      Did you forward e-mails other than those e-mails related to David Bovino?
>
> A      No, because there was really nothing else of concern besides that.[246]

And in the words of Kelly, echoing that concern, the real issue was *not* Andrew's well-being but rather, "winning the battle of Bovino."[247] The "Battle of Bovino" consisted in Defendants, along with Christina and Patricia, engaging in a relentless character assassination of Bovino, among each other, lawyers in this litigation and among Bovino's friends, clients, and strangers in his home town of Aspen, where he lives and practices law. The goal was to hang onto control of Andrew and his money by ending his relationship, both personally and professionally, with Bovino.

102.    Some of what happened to Bovino has been discussed above but one more aspect of this assault bears mention:  Patricia brought in Larry Dearman ("Dearman"), a private investigator who had been her ex-husband's—JHM III's—security guard years before[248] to investigate Bovino and that's when the harassment became dangerous.

103.    Among other things, Dearman spread false rumors around Aspen among Bovino's friends, family, clients, and strangers about Bovino's "drug use.  In February 2012, Dearman

---

[246]    C. MacMillan Dep. Tr. Mar. 27, 2013 12:18-21, Ex. 24.

[247]    Email from T. Kelly to J. Klein, L. Vagedes (Mar. 31, 2011), bearing Bates Nos. UBS890-891, Ex. 89 (Kelly stating, "I think we are winning the battle of Bovino but we are taking casualties.").

[248]    *See* J. Klein Dep. Tr. Mar. 28, 2013 120:2-7, Ex. 23.

emailed Patricia asking, "Patrica; Is it time to go after Bovino for his illegal drug use??et me know I believe I have done the work up to be able youse his activities to cUe him many problems with the Colorado Office of Attorney Regulation. [sic]. Larry."[249] Patricia forwarded this email to Klein and Vagedes at UBS.[250]   That is not surprising: UBS blessed the grievance against Bovino manufactured by Kelly.

104.    As noted above, two months later, on May 12, 2011, a person named "Margaret" with the email mameldeau@aol.com wrote to Patricia to express sympathy about the pending lawsuit against her in Aspen and Patricia had responded that Andrew wasn't the one suing her, but that Bovino—a drug user—was only using him, "Andrew not suing me drugie [sic] using him."[251]

105.    Dearman and Patricia told Jerry Bovino, David Bovino's father and the Bovino family friend that provided a home for Andrew from mid-September, 2012 to January, 2013, after Andrew fled Moab, that Bovino was dishonest, used illegal drugs, and that they were going to have him disbarred.  In a subsequent phone conversation, Dearman threatened that family friend that he knew all about that man's business relationship with an international bank and would use his contacts within that bank to destroy that relationship. Sometime in fall, 2013, Dearman made an appointment to see Bovino at his law offices in Aspen and appeared there on or about October 1, 2013, along with a female companion (whom he represented was unrelated to the MacMillan family). While there, Dearman confided all manner of personal information

---

[249]    Email String (Feb. 7, 2012), bearing Bates Nos. UBS2051-2052, Ex. 120.

[250]    *Id.*

[251]    Email String between P. MacMillan and "Margaret" (May 12, 2011), bearing Bates No. PMacMillan204, Ex. 97.

about JHM III and Patricia to Bovino.  He said that he'd worked as JHM III's personal

bodyguard even prior to the time that JHM III met Patricia and was aware of all of the

circumstances regarding the family dynamics. According to Dearman, JHM III instructed

Dearman to find twenty suitors as potential sperm donors for Patricia's children. He also said that

JHM III wanted him to impregnate Patricia and implied that he, Dearman, was the father of

Daniel, Patricia's first son. He said that all three of Patricia's boys born during her marriage to

JHM III had three different fathers, none of them JHM III. He told Bovino the name of the man

he said was Andrew's biological father, a golf pro in South Florida. Dearman went on to say that

he was a former crack cocaine addict who had been sober for the past fifteen years. Up to that

point the meeting had been friendly if odd, and then, Dearman, suddenly dead serious, threatened

Bovino that if he repeated any of what Dearman had said he would have him killed.

## IV.  CLAIMS FOR RELIEF

### First Claim for Relief
### (Invasion of Privacy by Intrusion)

106.    Plaintiffs re-allege and incorporate by reference the allegations of all the

foregoing paragraphs as if fully restated herein.

107.    UBS, Tim Kelly and Kelly and Hannah, P.A. intentionally intruded on Plaintiffs'

private professional affairs by, among other things (a) receiving and acquiescing to the

distribution of private information between Bovino and Andrew; (b) disseminating illegally

obtained communications regarding Andrew's and Bovino's private life and/or private affairs to

third parties; and (c) disseminating illegally obtained communications regarding Bovino's

representation of Andrew.

108.    A reasonable person would determine that this conduct is offensive.

109.    UBS's, Tim Kelly's and Kelly and Hannah, P.A.'s conduct and invasion has caused Plaintiffs substantial harm and damages, in an amount to be proven at trial.

110.    Because UBS, Tim Kelly and Kelly and Hannah, P.A. knowingly and intentionally acted with oppression, fraud and malice, and in wanton disregard of the rights and interests of Plaintiffs, punitive damages are appropriate.

### Second Claim for Relief
### (Invasion of Privacy by Appropriation)

111.    Plaintiffs re-allege and incorporate by reference the allegations of all the foregoing paragraphs as if fully restated herein.

112.    Defendants wrongfully and unlawfully used Bovino's names and identities for their own purposes and benefit including the purpose of obtaining attorney-client privileged and attorney work product information with respect to the attorney-client relationship between Plaintiffs and Andrew.

113.    Defendants' conduct through their use of Bovino's names and identities has caused Plaintiffs substantial harm and damages, in an amount to be proven at trial.

114.    Because Defendants knowingly and intentionally acted with oppression, fraud and malice, and in wanton disregard of the rights and interests of Mr. Bovino and his law firm, punitive damages are appropriate.

### Third Claim for Relief
### (Intentional Interference with Contractual Obligations)

115.    Plaintiffs re-allege and incorporate by reference the allegations of all the foregoing paragraphs as if fully restated herein.

116.    Bovino had a written contract with Andrew pursuant to which Andrew retained

Bovino to render legal services to him, and for which Andrew agreed to pay legal fees.

117.    Defendants had specific knowledge or reasonably should have known of the contract for legal services.

118.    Bovino  substantially performed the legal services for which they were retained, except to the extent that they were impeded in their ability and/or unable to do so as a result of the wrongful and unlawful conduct of Defendants.

119.    Defendants engaged in a course of conduct and actions through their orchestrated electronic scheme to pierce the attorney-client relationship between Plaintiffs and Andrew and disrupt Plaintiffs' business endeavors, which wrongfully, unlawfully and intentionally prevented Bovino from performing their duties to Andrew as his legal representative(s) and prevented Andrew from paying for the legal services rendered.

120.    Bovino suffered substantial harm and damages as a result of such conduct, and Defendants caused such harm and damages, in an amount to be proven at trial.

121.    Because Defendants knowingly and intentionally acted with oppression, fraud and malice, and in wanton disregard of the rights and interests of Bovino, punitive damages are appropriate.

## Fourth Claim for Relief
### (Intentional Interference with Prospective Business Advantage)

122.    Plaintiffs re-allege and incorporate by reference the allegations of all the foregoing paragraphs as if fully restated herein.

123.    Bovino had an ongoing relationship with Andrew with significant amounts of legal work projected for the future.  Furthermore, as a noteworthy and up and coming lawyer and

firm in Aspen, Colorado and Pitkin County, Plaintiffs had numerous existing and prospective relationships with potential clients and other individuals and entities.

124.    At all relevant times, Defendants were aware and had knowledge of Bovino's prospective relationship with Andrew and knowledge of some or all of the prospective business relationships that Bovino had with other individuals and entities, as well as the efforts Bovino made to establish such relationships with prospective clients, individuals and entities.

125.    In spite of this knowledge, Defendants engaged in the acts and conduct described herein, including Defendants' orchestrated electronic scheme to pierce the attorney-client relationship between Plaintiffs and Andrew and disrupt Plaintiffs' business endeavors, and Defendants' efforts to smear Bovino's reputation, which were designed to interfere with or disrupt the prospective business relationships that Bovino enjoyed with their existing and prospective clients and other individuals and entities.

126.    Defendants did so directly interfere with and disrupt these prospective business relationships that Bovino enjoyed with their existing and prospective clients and other individuals and entities.

127.    Defendants' conduct has caused Bovino substantial harm and damages in an amount to be proven at trial.

128.    Because Defendants knowingly and intentionally acted with oppression, fraud and malice, and in wanton disregard of the rights and interests of Bovino, punitive damage are appropriate.

**Sixth Claim for Relief**
**(Civil Conspiracy)**

129.    Plaintiffs re-allege and incorporate by reference the allegations of all the

foregoing paragraphs as if fully restated herein.

130.    Defendants, along with Christina and Patricia, agreed, by words or conduct, to accomplish the unlawful goals and/or accomplish a goal through unlawful means, by committing and/or participating in the conduct which is the subject of this Third Amended Complaint, and committed, directed, approved of, ratified and/or acquiesced in the acts herein alleged, with knowledge of the conspiracy and its goals and purpose.  Specifically, Defendants, along with Christina and Patricia, intentionally conspired to intrude upon Plaintiffs' attorney-client relationship with Andrew and Plaintiffs' business relationships with Andrew and other current and potential clients, through the fraudulent use of "www.bovinolaw.net" and "david@bovinolaw.net," and the access of an intrusion into Bovino's legal documents, work product and strategies.

131.    Defendants, along with Christina and Patricia's, conduct in this regard has caused substantial harm and damages to Plaintiffs in an amount to be proven at trial.

132.    Defendants, along with Christina and Patricia, knowingly and intentionally acted with oppression, fraud and malice, and in wanton disregard of the rights and interests of Plaintiffs.

<u>**Seventh Claim for Relief**</u>
<u>**(Electronic Communications Privacy Act, 18 U.S.C. § 2510 et seq.)**</u>

133.    Plaintiffs re-allege and incorporate by reference the allegations of all the foregoing paragraphs as if fully restated herein.

134.    Defendants intentionally intercepted, endeavored to intercept, or procured another person to intercept or endeavor to intercept, communications between Andrew and Bovino.

135.     Defendants intentionally disclosed, or endeavored to disclose, to other persons

the contents of communications, knowing or having reason to know that the information was obtained through the interception of a communication in violation of 18 U.S.C. § 2501. For example, UBS forwarded confidential and privileged electronic communications between Bovino and Andrew, which UBS knew were stolen, to Kelly.

136.    Defendants intentionally used, or endeavored to use, the contents of communications, knowing or having reason to know that the information was obtained through the interception of communication in violation of this subsection.

137.    The statutory exceptions of 18 U.S.C. § 2511 do not apply to Defendants' actions.

138.    Plaintiffs were aggrieved by Defendants' interception, disclosure, and use of improperly intercepted wire or electronic communications.

139.    Defendants' conduct caused Plaintiffs substantial harm and damages in an amount to be proven at trial.

140.    Plaintiffs are entitled to the greater of: (A) the sum of the actual damages suffered by the plaintiff and any profits made by the violator as a result of the violation; or (B) statutory damages of whichever is the greater of $100 a day for each day of violation or $10,000.

141.    Defendants' conduct in violation of the Electronic Communications Privacy Act warrants the imposition of punitive damages, the award of attorneys' fees, and the imposition of equitable remedies such as disgorgement.

## Eighth Claim for Relief
### (Computer Fraud and Abuse Act, 18 U.S.C. § 1030)

142.    Plaintiffs re-allege and incorporate by reference the allegations of all the foregoing paragraphs as if fully restated herein.

143.    Defendants, along with Christina and Patricia, conspired to commit offenses under 18 U.S.C. § 1030 (b) by, among other things, receiving, possessing, using, and distributing communications obtained in violation of 18 USC § 1030 (a).

144.    Through these actions, Defendants, along with Christina and Patricia, sought pecuniary gain, in particular to retain its position as trustee of Andrew's assets.

145.    As a result of Defendants' conspiracy with Christina and Patricia, Defendants obtained something of value, in particular, access to Andrew's and Bovino's confidential, work product, and attorney-client privileged communications.

146.    As a result of Defendants' conspiracy with Christina and Patricia in the intentional and unauthorized access or exceeding access to the Bovino's confidential and attorney-client information on Andrew's computer and via the World Wide Web, Bovino has been damaged in an amount exceeding $5,000.00 from the costs of investigation of Defendants' activities, and losses directly resulting from their actions.

## V.  PRAYER FOR RELIEF

WHEREFORE, Plaintiffs David A. Bovino P.C., dba Law Offices of Bovino & Associates, and David A. Bovino respectfully request entry of an order:

a.  Awarding damages to Plaintiffs David A. Bovino P.C., dba Law Offices of Bovino & Associates, and David A. Bovino in an amount to proven at trial;

b.  Awarding Plaintiffs Defendants' profits related to UBS's management of the trusts, Patricia's improper obtaining of funds from UBS, and Kelly's receipt of payments to interfere in Bovino's relationship with Andrew in an amount to be proven at trial for Defendants' violations of the Electronic Communications Privacy Act and the Computer Fraud and Abuse Act;

c.  Awarding costs incurred by Bovino to remedy the effects of Defendants' actions;

d.  Awarding punitive damages;

e.  Awarding any and all other statutory damages as the causes of action allow;

f.  Awarding equitable relief, including ordering disgorgement of proceeds collected as a result of Defendants' actions;

g.  Awarding any and all other common law damages as the causes of action allow;

h.  Awarding pre-judgment and post-judgment interest;

i.  Awarding any and all such other and further relief that the Court deems just and proper.

## VI.  JURY DEMAND

Plaintiffs hereby demand a trial by jury on all issues so triable.

Date: 02/07/2014                                     Respectfully submitted,

_/s/ David Berg_____
David Berg
Chris Gadoury
Maria-Vittoria G. Carminati
BERG & ANDROPHY
3704 Travis Street
Houston, Texas 77002
Telephone: (713) 529-5622
Email: dberg@bafirm.com

Gordon W. Netzorg
Theodore McCombs
SHERMAN & HOWARD LLC
633 17th Street, Ste. 3000
Denver, CO 8020
Ph: 303.299.8381
Fax: 303.298.0940
Email: snetzorg@shermanhoward.com

**ATTORNEYS FOR PLAINTIFFS**